GULF COAST TRANSPORTATION COMPANY, A CORPORATION, *Plaintiff in Error,* v. C. A. HOWELL, *et al.,* PARTNERS AS HOWELL & SON, *Defendants in Error.*

Opinion Filed June 8, 1914.

1. The usage or custom that may have the force and effect of law or of an implied contract or of a constructive delivery of goods, must be clearly and definitely proven; and where the evidence is uncertain and also contradictory, the usage or custom is not established.

2. In this action to recover the value of barrels of rosin placed at steamboat landing on a river where there was no warehouse or agent, or wharf and carried away by an unusual freshet, brought upon the ground that the steamboat company, disregarding its constant and habitual custom and usage, negligently failed to stop and take the rosin on the first trip of the boat past the landing, the evidence is held not to show a breach of an implied contract or of a legal duty or actionable negligence so as to make the defendant liable as alleged in not taking the barrels of rosin as freight on the first trip of the boat past the river bank where the rosin was placed by the plaintiff at an unsafe point without giving notice to the defendant.

SHACKLEFORD, C. J., AND COCKRELL, J., dissent.

Writ of Error to Circuit Court for Lafayette County; F. A. Whitney, Judge.

Judgment reversed.

*Hendry & Whitnell,* for Plaintiff in Error;

*C. C. Howell,* for Defendants in Error.

WHITFIELD, J.—The declaration alleges that the defendant steamboat company disregarding a constant and habitual custom and usage in the premises carelessly and negligently failed to stop at a river landing, and to accept and receive promptly and securely carry therefrom barrels of rosin placed at said landing, and that in consequence of which negligence of the defendant 16 barrels of rosin were lost by a great rise of the waters of the river. There was a plea of not guilty and special pleas as to the dangers of navigation in the rising state of the river, and as to the usage in receiving freight. The substance of the testimony is as follows: One of the plaintiffs testified: "It was customary to place the rosin on the bank of the river; there was no warehouse or dock to put the rosin in. When the rosin was so placed at the landing it was customary for defendant's boat to land and take the rosin and to deliver it either at Branford or at Old Town to the railroad agent and the railroad agent understood where the rosin was to be shipped without instructions; if we changed the consignee we always notified the agent. It was the custom for defendant's boat to stop and take on the rosin so placed upon the bank of the river at Rocky Bluff landing without any instructions or notice to the defendant. They understood that it was to be delivered to the railroad either at Bran-

ford, or Wannee or Old Town, and the agent at each of the places understood where it was to be shipped to. The rosin in question was placed by the plaintiffs at Rocky Bluff landing on the 24th day of April, 1912; there were 101 barrels of rosin so placed at Rocky Bluff landing to be shipped. It was the custom for the said rosin to be marked 'Howell & Son' after the partnership was formed, but I had been shipping rosin prior to that, that is prior to the partnership, which rosin was marked 'C. A. H.' The rosin placed at Rocky Bluff landing on the 24th day of April was marked in the usual way. On that date sometime about two o'clock in the afternoon, and while the 101 barrels of rosin were at the landing, defendant's boat passed down. I did not see the boat; could not say positively that it was defendant's boat, but I heard it blow and recognized the whistle as that of defendant's boat; I was familiar for several years with the whistle of the 'Hawkinsville;' that at that time the defendant had no other boat upon the river but the Steamer Hawkinsville and had not had for some time, and so far as I am aware there were no other large boats plying the river at that time. The boat did not stop and take on the rosin as it was accustomed to do. The river was rising at that time and rose to a great height; the highest I have ever known it, and I have known it for years. It continued to rise and it was about ten days after the said 24th day of April before it reached its height. It rose to and over the barrels of rosin and when the river had fallen it had washed away sixteen barrels. The sixteen barrels which were washed away were the 'water white' rosin. The reason for saying it was the water white rosin which was washed away is because it will float and the other will not. The high grade rosin will float and the cheaper grades will not. All the water white rosin was not

washed away; there were several barrels in the bunch and some of the water white rosin remained; it was wedged in between the other barrels and could not float away. The value of the water white rosin at the time was about $12 per barrel, less the freight; it netted in the neighborhood of $12 per barrel. After April 24th, but before the remaining 85 barrels were carried away by defendant, the Str. Hawkinsville came back to Rocky Bluff Landing from Old Town and unloaded a cargo of spirit barrels for the plaintiffs; that so far as I know the boat never passed said landing without stopping and taking on rosin placed there for carriage at its first trip passed. Later the defendant's boat came up and carried away the remaining 85 barrels of rosin and transported it according to the custom and that without further instructions from us. If the rosin had been moved back 100 feet it would perhaps have been safe from the water."

A witness for the plaintiff testified: "I was in the employ of Howell & Son at the time the rosin was washed away for which this suit is brought. I was at Rocky Bluff Landing on the night of the 24th, 1912, and the rosin was there and the river was still rising. At the time I was there that night the water was several feet from the barrels of rosin; it had not risen to where the barrels of rosin were at the time I was there by several feet."

Another witness for the plaintiffs testified: "I am a physician now, but at one time was purser on defendant's boat plying the Suwanee River. It was customary for our boat to stop at Rocky Bluff landing and take on rosin which had been placed there, and without any instructions and only with the initials of the consignor on the barrels. It was the general rule to stop and take on the rosin at the first passing of the boat, but if we were

loaded we would sometimes pass without taking it on and then later double back and get it."

The only witness for the defendant testified: "I am a steamboat man and was in the employ of the defendant during the year 1912, and prior thereto. I was in their employ as Captain on the Str. Hawkinsville at the time of the alleged loss of rosin in this case, on the 24th day of April, 1912, but I was not on the boat on that particular trip. I was sick and was not on the boat, and the boat that trip was in command of a man by the name of Davis. I am entirely familiar with the Suwanee River, particularly that part of it from the Gulf to Branford. I am also familiar with Rocky Bluff Landing; I often hauled rosin for the plaintiffs. I am familiar with all the customs that prevail along said river relative to shipping freight on defendant's boats, and it was not the custom to stop and take on rosin at Rocky Bluff landing every time rosin was placed there for shipment. Sometimes we stopped and took it on without any instructions and sometimes we did not. Sometimes we were informed by the railroad agent at Branford that a shipment of rosin at Rocky Bluff landing was ready, then we would stop and take it on. If we did not receive such notice I exercised my own judgment as to whether we should stop and take it on or whether we should pass by and leave it for another trip. When the amount of rosin on the bank indicated as much as a car load we usually stopped and took it on. If I had been on the boat at this particular trip I would perhaps have stopped and taken on the rosin, if a large oak tree standing just below the landing had not prevented. Later I returned with the boat at a time when the river was higher and discharged a quantity of spirit barrels for the plaintiffs at Rocky Bluff landing and succeeded in doing so without any mishap.

At the time referred to, that is, April 24, 1912, a very great freshet was on the Suwanee River, and the river arose very rapidly. When the river was up it was then it became dangerous to navigate. It was exceedingly dangerous to attempt to pass through the draw of the bridge at night, at Old Town in going down stream when the river was up. It would have required from one and a half to two hours to have stopped the boat at Rocky Bluff and have taken on 101 barrels of rosin. If the boat passed the landing at about two o'clock, if it had stopped to take on the rosin it would have gotten away about 3:30 o'clock and to the bridge at Old Town in the night. I sometimes laid up at Wannee overnight and gone on to Old Town next morning."

There was a judgment for the plaintiffs, and the defendant took writ of error.

It appears that the plaintiffs placed 101 barrels of rosin at the river landing in a position where it was reached by an apparently unprecedented freshet, and left it there without giving any notice to the steamboat company; that before the barrels were removed by the steamboat company 16 of them were carried away by an unusual rise in the river; and that the steamboat company subsequently took as freight the remaining barrels of rosin. The plaintiffs knew of the rising condition of the river, and the defendant was no more bound to anticipate an unusual freshet than were the plaintiffs; and the defendant did not select the place where the barrels were put on the landing and was not notified of the placing of the barrels in the unsafe place at the landing. If the rosin had been placed further from the river it would not have been reached even by the great freshet. The question presented is whether the defendant is liable for the lost rosin because it did not take it as freight at the

514    SUPREME COURT OF FLORIDA.

Gulf Coast Trans. Co. v. Howell *et al.*—Opinion of Court.

first trip of the boat past the landing, the immediate and direct cause of the loss being the unusual freshet which reached the rosin at the point where it was placed by the plaintiff, knowing of the rising river and without giving notice to the defendant. There was no contract with the defendant relative to the shipment of the rosin and no actual or constructive delivery of the rosin to the defendant. There was no actual or constructive transfer of the possession or control of the rosin from the plaintiff to the defendant. There are no statutory or other governmental regulations affecting the subject or the rules of liability or of evidence relative thereto.

A usage or custom to have the force and effect of law or of an implied contract or of a constructive delivery of goods, must be clearly and definitely proven; and where the evidence is uncertain and also contradictory, the usage or custom is not established. See 12 Cyc. 1100.

One of the plaintiffs testified that "the boat did not stop and take on the rosin as it was accustomed to do." "That so far as I know the boat never passed said landing without stopping and taking on rosin placed there for carriage at its first trip passed." A witness for the plaintiff testified that "it was the general rule to stop and take on the rosin at the first passing of the boat, but if we were loaded we would sometimes pass without taking it on, and then later double back and get it." The only witness for the defendant, the regular captain of the steamboat, testified: "I am familiar with all the customs that prevail along said river relative to shipping freight on defendant's boats, and it was not the custom to stop and take on rosin at Rocky Bluff landing every time rosin was placed there for shipment. Sometimes we stopped and took it on without any instructions, and sometimes we did not. Sometimes we were informed by the railroad

agent at Branford that a shipment of rosin at Rocky Bluff was ready, then we would stop and take it on. If we did not receive such notice I exercised my own judgment as to whether we should stop and take it on or whether we should pass by and leave it for another trip. When the amount of rosin on the bank indicated as much as a car load we usually stopped and took it on. If I had been on the boat at this particular trip I would perhaps have stopped and taken on the rosin, if a large oak tree standing just below the landing had not prevented."

The plaintiff's witness who states that *so far as he knew* the boat never passed the landing without taking rosin placed there, did not state the extent of his knowledge on the subject; and the other witness for the plaintiffs states that it was "the general rule" to take the rosin at the first passing of the boat, but there were exceptions when the boat would "later double back and get it." On the other hand the defendant's witness shows his knowledge of the subject and directly contradicts the plaintiff's testimony as to the existence of a usage or custom binding on the defendant. The evidence of the plaintiffs' witnesses on the vital point is uncertain, and it is also contradicted by a well informed and unimpeached witness for the defendant. Under these circumstances it cannot be said, even after giving due weight to the verdict, that a usage or custom imposing liability on the defendant is clearly and definitely proven as the law requires.

The evidence does not show that there was a breach of an implied contract or of a legal duty, or actionable negligence of the defendant steamboat company in not taking the barrels of rosin as freight on the first trip past the river landing, even if that may fairly be regarded as the proximate cause of the loss of the rosin which was put at an unsafe place by the plaintiff and carried away

by the great rise in the river. In Meriam v. Hartford & New Haven R. Co., 20 Conn. 354, the boat was at the dock when the goods were left for shipment and someone apparently having authority assented to the delivery of the goods for shipment in the usual manner. In other cases of liability where there was no delivery to the carrier there was notice or an express or implied contract binding on the defendant carrier. See Evansville & T. H. R. Co. v. Keith, 8 Ind. App. 57, 35 N. E. Rep. 296.

The judgment is reversed and a new trial awarded.

TAYLOR AND HOCKER, J. J., concur;

SHACKLEFORD, C. J., AND COCKRELL, J., dissent.