ATLANTIC COAST LINE RAILROAD COMPANY, A CORPORATION, *Plaintiff in Error,* v. WILSON & TOOMER FERTILIZER COMPANY, A CORPORATION, *Defendant in Error.*

Division B.

Opinion Filed March 2, 1925.

Petition for Rehearing denied June 23, 1925.

1. A common carrier of goods is an insurer against all risks of loss or injury, except those resulting directly from the act of God or the public enemy and without the intervention of human agency.

2. When the circumstances of a claim against a common carrier clearly warrant a full investigation of and a test of the legality and justness of the claim, to impose heavy penalties for doing so, even under statutory authority, would deny to the defendant the rudiments of fair play which would violate the provisions and principles of the Fourteenth Amendment to the Federal Constitution, and of Sections 1, 4 and 12 of the Declaration of Rights of the Florida Constitution.

3. The words "at which there is no regularly appointed agent" apply to both clauses of the following provision of the Uniform Bill of Lading, approved by the Interstate Commerce Commission: "Property destined to or taken from a station, wharf or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloaded from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves· or landings, shall be at owner's risk until the cars are attached to and after they are detached from trains, or until loaded and after unloaded from vessels." Yazoo & M. V. R. Co. v. Nichols & Co., 256 U. S. 540, 41 Sup. Ct. Rep. 549.

4. The usage or custom that may have the force and effect of law or of an implied contract or of a constructive delivery of goods, must be clearly and definitely proven; and where the evidence is uncertain and also contradictory, the usage or custom is not established.

5. When a definite and certain usage or custom constituting a constructive delivery of freight to a common carrier, is not clearly proven, a charge which assumes that the facts in evidence prove the usage or custom, is erroneous.

A Writ of Error to the Circuit Court for Duval County; DeWitt T. Gray, Judge.

Reversed.

*Doggett, Christie & Doggett,* for Plaintiff in Error;

*Milam & Milam,* for Defendant in Error.

WHITFIELD, P. J.—In an action to recover $3,512.61 damages with penalty, interest and attorney fees for three car loads of fertilizer lost or injured by fire after an alleged constructive delivery to the carrier at Jacksonville, for an intra-state shipment, judgment for the amount of the claim and legal interest with attorney fees was rendered for the plaintiff, and defendant took writ of error.

It is contended that a demurrer to the declaration should have been sustained because the negligence alleged is not stated to have been the cause of the loss. Though the second count of the declaration appears to predicate the loss upon negligence of the defendant as a common carrier, the liability of the carrier is not merely for negligence, but for the loss or damage to the freight; and even if the second count of the declaration is designed to state liability for a mere bailment and does not specifically allege negligence as a proximate cause of the loss, the first count includes an allegation of delivery and appears to be legally sufficient to state liability of the defendant as a common carrier.

"The liability of a common carrier of goods is that of an insurer; and in cases of loss of or injury to goods entrusted to it for transportation no excuse avails the carrier, except

that such loss or injury was caused by the act of God, or by the public enemies of the State or by the sole fault of the shipper or his agent. 1 Moore on Carriers 306. A common carrier of goods is an insurer against all risks of loss of injury, except those resulting directly from the act of God or the public enemy and without the intervention of human agency. Clyde Steamship Co. v. Burroughs, 36 Fla. 121, 18 South. Rep. 349; Seaboard Air Line Ry. v. Mullin, 70 Fla. 450, text 453, 70 South. Rep. 467; 4 R. C. L. 696-8; 10 C. J. 107 et seq.

In Gulf Coast Transp. Co. v. Howell & Son, 70 Fla. 544, 70 South. Rep. 567, negligence was alleged to show that an act of God, an unprecedented flood, was not the sole cause of the loss, but that defendants' neglect of duty arising out of a custom in the discharge of its common carrier functions was a concurring cause of the loss. See Seaboard Air Line Ry. v. Mullin, supra; Gulf Coast Transp. Co. v. Howell, 67 Fla. 508, 65 South. Rep. 661.

The denial of a motion to strike from the declaration the demands under Sections 4581, 4582 and 4583, Revised General Statutes, 1920, for fifty per cent per annum interest and attorney fees as a penalty for non-payment of the claim within sixty days from its filing with the carrier's agent, need not be considered as to the penalty interest, since the judgment includes only the damages shown and legal interest thereon, and attorney fees.

As to the validity of the statutory provision of fifty per cent per annum and attorney fees, see Chicago & N. W. R. Co. v. Nye Schneider Fowler Co., 260 U. S. 35, 43 Sup. Ct. 55, where it is held that statutes of this nature ''are to be judged by their application in the particular case; where the result is fair and reasonable, they will be sustained; aliter where it is so arbitrary, unequal and oppressive as to shock the sense of fairness,'' and to violate the Fourteenth Amendment. The possible arbitrary, unequal and oppres-

sive operation of the penalty provisions of the statute, now Sections 4581, 4582 and 4583, Revised General Statutes, 1920, in cases not within the limitations stated in Seaboard Air Line Ry. v. Seegers, 207 U. S. 73, 28 Sup. Ct. Rep. 28, is referred to in Atlantic Coast Line R. Co. v. Coachman, 59 Fla. 130, text 158, 52 South. Rep. 377.

In view of the amount of the claim, the unusual circumstances of the case and the uncertainty of the defendant's liability, it was the defendant's right to fully investigate and test the legality and justness of the claim; and to impose heavy penalties for doing so, even under statutory authority, would deny to the defendant the rudiments of fair play which would violate the provisions and principles of the Fourteenth Amendment to the Federal Constitution, and of Sections 1, 4 and 12 of the Declaration of Rights of the Florida Constitution. See Chicago & N. W. R. Co. v. Nye Schneider Fowler Co., *supra; Ex Parte* Young, 209 U. S. 123, 28 Sup. Ct. Rep. 441; Florida East Coast R. Co. v. State, 79 Fla. 66, 83 South. Rep. 708, 11 A. L. R. 884, Notes. Besides this, unreasonable penalties and damages tend to increase service rates or to reduce service efficiency, which is detrimental to the public who are patrons of the common carriers. See Florida East Coast R. Co. v. Geiger, 64 Fla. 282, text 294, 60 South. Rep. 753. Apparently this was appreciated by the trial court and by the plaintiff's counsel who acquiesced in the award of the amount of the claim with legal interest without the penalty interest demanded in the declaration under the statute. No harm resulted to the defendant by the denial of the motion to strike from the declaration the demand for penalty interest.

The charge of the court to the jury that "if you find from the evidence that the plaintiff is entitled to recover, you will include and assess in your verdict interest at the rate of 50 per cent per annum on the principal sum so found by you," was, as to the allowance of penalty interest,

not a permissible application of the statute to the facts of this case; but the verdict approved by the court awarding only legal interest rendered the quoted charge harmless.

The freight was loaded Saturday afternoon and the cars were not moved before the fire occurred early the next Monday morning.

The defendant contends that even if there was a constructive delivery to it of the freight in the loaded cars standing on the defendant's side track at the plaintiff's fertilizer factory, the cars had not been attached to a train, and the defendant was not liable under the following provision in the usual bill of lading: "Property destined to or taken from a station, wharf or landing at which there is no regularly appointed agent shall be entirely at risk of owner after unloaded from cars or vessels or until loaded into cars or vessels, and when received from or delivered on private or other sidings, wharves or landings, shall be at owner's risk until the cars are attached to and after they are detached from trains, or until loaded into and after unloaded from vessels."

The defendant had a regularly appointed agent at Jacksonville, the station where the cars were loaded and from which the freight was to be shipped.

"The quoted provision is contained in the Uniform Bill of Lading, approved by the Interstate Commerce Commission, and has been interpreted and applied contrary to this carrier's contention in Yazoo & M. V. R. Co. v. Nichols & Co., 256 U. S. 540, 41 Sup. Ct. Rep. 549, affirming Yazoo & M. V. R. Co. v. Nichols & Co., 120 Miss. 690, 83 South. Rep. 5; McClure v. Norfolk & W. R. Co., 83 W. Va. 473, 98 S. E. Rep. 514; Jolly v. Atchison, T. & S. F. R. Co., 21 Cal. App. 368, 131 Pac. Rep. 1057.

This case is clearly differentiated from Standard Combed Thread Co. v. Pennsylvania R. R. Co., 88 N. J. L. 257, 95 Atl. Rep. 1002, L. R. A. 1916C 606; and if other cited cases

are decided on a contrary construction of a provision similarly worded and punctuated, and not upon dissimilar facts, the decision in Yazoo & M. V. R. Co. v. Nichols & Co., 256 U. S. 540, 41 Sup. Ct. Rep. 549, should control in an intrastate shipment, as here, to insure desirable uniformity of interpretation in view of the intimate relation between interstate and intrastate transportation by common carriers.

The right of the plaintiff to recover in this case is predicated upon an asserted constructive delivery of the freight to the common carrier pursuant to a custom or usage from a long continued course of dealing between the plaintiff and the defendant.

The usage or custom that may have the force and effect of law or of an implied contract or of a constructive delivery of goods, must be clearly and definitely proven; and where the evidence is uncertain and also contradictory, the usage or custom is not established. Gulf Coast Transp. Co. v. Howell, 67 Fla. 508, 65 South. Rep. 661; 17 C. J. 449, 481, 523; 4 R. C. L. p. 692 *et seq.;* 12 Cyc. 1100; Gulf Coast Transp. Co. v. Howell & Son, 70 Fla. 544, 70 South. Rep. 567.

The contention of the plaintiff below is that it complied with a custom or usage showing a binding constructive delivery to the carrier, which alleged custom or usage was the loading and sealing of the cars on the carrier's side track at the plaintiff's fertilizer factory and the filling in of an ''O. C. Form'' of ''shipping ticket'' of the defendant, stating ''the car number and initial consignor, the consignee, destination, route and contents, and placing said forms at a place and in a receptacle where for years past the switching conductor and agent of the defendant had been habitually accustomed to take and receive them; that the defendant had constantly and habitually accepted and carried the freight so loaded by plaintiff for transportation and

removed said cars so loaded within thirty hours after load-
ing and sealing.'' The custom or usage must be given in
evidence. 12 Cyc. 1101.

To prove the usage or custom, the plaintiff's witness
testified that the cars are loaded and sealed and the de-
fendant's O. C. forms in quadruplicate made out, signed
by the shipper's agent and put in a certain place for the
carrier's switching conductor to get the O. C. forms from
such usual place and to move the cars within 24 hours as
was his custom, the conductor leaving the one of the O. C.
forms he had signed and taking the others for the carrier's
purposes; that no notice of the shipment was given to the
carrier; that the plaintiff would the next business day pre-
sent the O. C. form signed by the conductor to the carrier's
agent at his office two blocks away and get a bill of lading
for the shipment; that this custom with respect to placing
the O. C. forms had continued ever since the O. C.'s had
been in effect, which was two or three years; that they
were put in effect by the Government when they had
charge; that it was not their custom to nor did the railroad
require that they give them, notice that the cars were ready
for movement; that when the cars were loaded and ready
the railroad would come in there and whatever they had
loaded, why the O. C.'s were there for them and they would
sign the O. C.'s and take the cars out; that they came in
every afternoon about five o'clock; that their factory closes
at five o'clock on week days and 4:30 on Saturday after-
noons, and they gave the railroad no further notice; that
in all the time he had had charge of this work it was never
the custom or practice for him to notify the railroad of the
readiness of those cars for movement, and he has seen them
come in there and get cars; that they would come in the
afternoon about five o'clock and the engines would not
couple up the cars, and the conductor would come on and
come to the office and see which cars were ready and the

O. C. forms made out, then sign them up and go out and couple them up and take out the ones that were finished; that this was generally after business hours, after the factory closed; that sometimes it varied a little but as a general rule they got them about five o'clock, and that it was not customary for him to stay there and give them the O. C. forms, which were laid there in the place where they would find them; that these cars were loaded and sealed and the O. C. forms made out before 4:30, the closing hour on that Saturday, and for each of the cars he placed the required O. C. form in the accustomed place in reliance on the custom that the railroad would receive them; that he does not know that it was a custom in addition to the custom which he has detailed in his testimony, between the Atlantic Coast Line Railroad Company, and the Wilson & Toomer Fertilizer Company .to consider that the liability of the railroad company for freight did not commence until their engines had been coupled to the cars which had been loaded at their warehouse; that he will not say that it was not the custom, but he has no information on it.''

Another of plaintiff's witnesses testified: ''That the railroad company habitually moves cars so placed every evening after they get through their work, giving them less than a twenty-four hour service; that they moved them every night and this was a custom they had come to rely upon; that this is the way they delivered outgoing cars to the Coast Line; that it was not necessarily the custom to give the railroad company any notice that cars were ready to go. That the notice was just to put the O. C. forms for them and if the O. C.'s were there it was up to them to look for them. That the defendant railroad company receipted for the cars by signing the O. C.'s which was done by the conductor of the switch engine. That this custom with respect to the O. C. forms and moving the cars within that time continued for as much as two years previous to

the fire." On interrogatories by the plaintiff, an agent of the defendant testified: "Is it not the fact that the shipping ticket known as Form OC-1 so used by the plaintiff was inaugurated by the defendant for the express purpose of preventing delay to cars waiting on bills of lading? A. Yes. Is it not the fact that the said OC-1 form is the Railroad document by which the defendant then accepted from plaintiff cars for transportation? A. Yes. Is it not the fact that said OC-1 form was the document by which the defendant then billed out cars and forwarded to destination without waiting for formal bill of lading? A. Yes."

The latter witness called by the defendant testified that in addition to the evidence for the plaintiff as to the usage between the parties hereto "there was a well recognized custom existing between the Wilson & Toomer Fertilizer Company and the Atlantic Coast Line Railroad Company at the time of this fire with reference to when the liability of the railroad company for these shipments commenced, and that this custom was that when the OC-1 was signed by the Yard Conductor and the car pulled from the industry the railroad's responsibility started at that time;" and on cross that "there were two agents in the City of Jacksonville, and one at the Florida Transfer, and that he is agent at the Export Terminals, which he presumes is in the city limits of Jacksonville. That his office is about two city blocks, probably three or four or five hundred yards from the plant of the Wilson & Toomer Company and he is agent for all that Export Terminals out around Talleyrand Avenue, and is put there to handle the traffic out at that portion of the town. That he does not deny that the Atlantic Coast Line gave the Wilson & Toomer Fertilizer Company a twenty-four hour service on their afternoon carload lots, and that according to his interpretation the railroad company's liability commences at the time that the Conductor signs the O. C. form, but he never had any ex-

press written agreement with Wilson & Toomer to that effect, but that is just his understanding. That after the OC-1 leaves Wilson & Toomer the signed copy is brought to him—some time after the car has been moved, to issue a bill of lading, which is oftentimes done after the car has already gone on, but about the particular facts of the custom that existed between the switch conductor and the Fertilizer Company he was not qualified to testify as he had nothing to do with it.

"On re-direct examination the witness further testified that his understanding of the custom was that the Coast Line's liability commenced when the OC-1 was signed and the engine coupled to the cars."

There is other evidence bearing on the existence of a custom or usage of the parties, but it does not show with definiteness and certainty what was considered a delivery to the carrier or when the liability of the defendant as a common carrier would begin under the facts constituting the usage or custom, no rule of law being shown that clearly operates to fix the rights of the parties under the asserted usage or custom. If the liability of the defendant as a common carrier began upon the signing of the O. C. forms as indicated by some of the testimony, there is no showing of such signing. If merely placing the O. C. forms at the usual place constituted a constructive delivery under the custom, it should be clearly shown, or other facts constituting a delivery should be duly proven to fix the defendant's liability as a common carrier, the capacity in which it is sued here. The mere custom to take up the O. C. forms and to move the cars within 30 hours after they are loaded and sealed, does not necessarily make the putting the O. C. forms in the accustomed place a constructive delivery under a certain and definite usage or custom binding on the parties.

There is positive evidence that the filled in O. C. forms

were put in the usual place, *viz*, under a weight on a shelf in plaintiff's factory, about 4:30 P. M., Saturday, October 2, 1920; and this evidence is corroborated. The defendant's conductor testified that about 5:30 P. M. that day and again on Sunday he looked in the usual place for the O. C. forms as he had theretofore done, but they were not there, and that he did not pull any cars out on that occasion because there were no bills or O. C.'s for them. The plaintiff's factory closed at 4:30 P. M. Saturday, but the place where the O. C. forms were put was accessible to the defendant's conductor at all times.

A fire originating in the plaintiff's factory burned the loaded cars on the defendant's side track at plaintiff's factory early Monday morning, October 4, 1920, before the opening hour at the factory. There is no evidence of a custom to move the cars within a stated or reasonable time after they are loaded and sealed by the shipper, without reference to the use of the O. C. forms, so as to make it the duty of the conductor to look for loaded cars.

The court charged the jury, "That if you find from the evidence in this case that through established usage and custom the plaintiff and defendant in this case had, at the time of the damage to the goods involved in this suit, agreed that the deposit of goods by plaintiff for transportation by defendants to a particular place and in a particular manner—that is, by loading the goods in carload lots upon the spur track belonging to the defendant extending alongside the plaintiff's factory, and by the plaintiff sealing the cars and making out the required O. C. forms and placing them in the accustomed place, and that according to the established custom or usage the defendant was required to remove the cars so loaded and sealed within 30 hours after sealing of the same and making out and placing the OC-1 form as alleged in the declaration, and if you find that the goods involved in this suit were deposited by plaintiff in

conformity to such agreement and custom for transportation by defendant and the required O. C. forms made out and placed in the accustomed receptacle and that the defendant did not remove the goods within the 30 hours according to the usage and custom, then I charge you that such deposit and the performance of such acts by the plaintiff constituted a delivery to the defendant of the goods regardless of the character of the place of deposit or its situation or the lack of express notice to the defendant and the defendant is liable to the plaintiff for any loss or damage to said goods sustained after such delivery to the defendant.''

In view of the plaintiff's burden to clearly show a constructive delivery pursuant to a *definite and certain* usage or custom, and of the uncertainty in the testimony as to the essential elements of the usage or custom, particularly upon the point whether the constructive delivery and consequent liability of the defendant as a common carrier began after loading and sealing the cars when the O. C. forms were placed in the usual receptacle for the switching conductor, or after the signing of the O. C. forms by the defendant's switching conductor, or upon the attaching of the cars to a train for movement, the charge of the court that the loading and sealing of the cars and the placing of the O. C. forms in the accustomed receptacle and the non-removal of the goods within thirty hours according to the usage and custom, if so found by the jury, "constituted a delivery to the defendant of the goods regardless of the character of the place of deposit or its situation or the lack of notice to the defendant," &c., was not justified by the evidence, since the particular facts that constituted a delivery pursuant to the usage or custom under which a constructive delivery was claimed, were not clearly and definitely proven with sufficient certainty to fix the liability of the defendant as a common carrier.   See 22 A. L. R.

970 Notes; Kansas City, M. & O. Ry. Co. v. Cox, 25 Okla. 774, 108 Pac. Rep. 380, 32 L. R. A. (N. S.) 313; L. R. A. 1916C 606 Notes; Gulf Coast Transp. Co. v. Howell & Son, 70 Fla. 544, 70 South. Rep. 567. In Pine Bluff & A. R. Ry. Co. v. McKenzie, 75 Ark. 100, 86 S. W. Rep. 834, and similar cases notice that the loaded cars were ready for movement, was given to the agent of the carrier. No notice was given in this case.

In addition to the debatable legality of the award of attorney fees under the particular facts of this case, the judgment for damages rendered upon the theory that a constructive delivery of the freight to the defendant as a common carrier pursuant to a binding usage or custom could have been legally found by the jury, is not sustained by legally sufficient probative evidence.

In the Mississippi, West Virginia and other cases cited, a bill of lading had been issued to the shipper.

Reversed for a new trial.

WEST AND TERRELL, J. J., concur.

TAYLOR, C. J., AND ELLIS, J., concur in the opinion.

BROWNE, J., dissents.

BROWNE, J., dissenting.

One of the issues submitted to the jury by the charge of the court, was whether or not the evidence showed and established a usage or custom in the manner in which the shipments of fertilizer by the plaintiff were delivered to and accepted by the defendant.

The jury by its verdict found that there was a definite and certain usage or custom, and our opinion of the mere uncertainty of the testimony to establish this custom, does

not warrant, under the repeated decisions of this court in criminal cases, the substitution of our view as to the weight of the testimony, for that of the jury.

All the questions of law contended for by the plaintiff in error are decided adversely to him by this decision, and the judgment is reversed solely on the question whether or not the evidence proved a usage or established custom.

This question was not raised by the plaintiff in error, either in the assignments of error or in his brief; no doubt, because the rule seemed too well settled, that the finding of a jury on a question of fact will not be disturbed if there is any substantial evidence to support it.

If that rule means anything it should be applied alike in civil and criminal cases, but if it is to be deviated from occasionally in civil cases, it might as well be abandoned.

I sometimes doubt the soundness of the rule, in view of the provisions of Section 2918, Revised General Statutes, 1920, which provides:

"It shall be the duty of the court on an appeal or writ of error to examine the record, to reverse or affirm the judgment, sentence or decree of the court below, or to give such judgment, sentence or decree as the court below ought to have given, or as to it may appear according to law."

If, however, this court is so committed to the rule, that it will not interfere with the verdict of a jury on a question of fact where there is substantial evidence to sustain it, it seems to me that the judgment in this case should be affirmed.