DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**TRANSCAPITAL BANK,** a Florida bank;
**THE PALMS I OF VERO BEACH, LLC,** a Florida limited liability
company; **LEONARD E. ZEDECK,** an individual; and
**WILLIAM E. HIMES,** an individual,
Appellants,

v.

**SHADOWBROOK AT VERO, LLC,** a Florida limited liability company;
**JOHN Q. NAIMI** a/k/a **HOSSEIN MOH NAIMI,** individually;
**DJS ENTERPRISES, LLC;** and
**PALM BEACH GROUP INVESTMENT, INC.,**
Appellees.

No. 4D14-4650

[July 26, 2017]

Appeal and cross-appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Cynthia L. Cox, Judge; L.T. Case No. 312010CA073480.

Hinda Klein of Conroy Simberg, Hollywood, for appellants.

Richard H. Bergman and Harrison T. Bergman of Bergman & Jacobs, P.A., Hollywood, for appellant Transcapital Bank.

Robin Bresky and Jonathan Mann of the Law Offices of Robin Bresky, Boca Raton, for appellees.

GERBER, C.J.

The seller of condominium units (and the seller's related representatives) appeal from an order granting the buyer's motion for new trial on the buyer's claims for fraud (count I) and combined claim for conversion and civil theft (count II). The seller and its representatives primarily argue that the trial court should have granted their motion for directed verdict on both counts. We agree with the seller and its representatives, and therefore reverse for entry of judgment in their favor on both counts. We also reverse for entry of judgment on the seller's counterclaim for breach of guaranty against the buyer's representative.

## *Procedural History*

This case arose from a transaction in which the buyer, co-plaintiff Shadowbrook, purchased 123 condominium units, out of a total of 164 units in the project, from the seller, co-defendant Transcapital.

To complete the purchase, Shadowbrook agreed to assume a prior owner's loans on the 123 units totaling $10,934,700, in exchange for which Shadowbrook provided Transcapital a mortgage on the units.

As part of the transaction, Transcapital also loaned Shadowbrook an additional $700,000 as a line of credit, of which $150,000 could be used for renovations and the remainder used for loan payments on the primary loan during the renovations.

The note for the $700,000 loan was signed by Shadowbrook's principal, co-plaintiff John Naimi, on behalf of co-plaintiffs DJS Enterprises and Palm Beach Group Investment.

Naimi had agreed to the transaction following conversations with Transcapital's president, co-defendant William Himes, and Transcapital's general counsel, co-defendant Leonard Zedeck. Naimi formed Shadowbrook just before the closing as the entity taking title to the units.

As part of the transaction, Naimi gave Transcapital a personal guaranty in the amount of $1 million. Another of Naimi's companies, co-plaintiff DJS Enterprises, paid $8,500 for an appraisal fee.

After the closing, Shadowbrook began renovating the units, but ran out of money. Naimi went to Transcapital, which loaned him an additional $400,000, with a second mortgage on his Maryland home as collateral.

Unfortunately, Shadowbrook and Naimi defaulted on the mortgages.

Before Transcapital could sue Shadowbrook and Naimi for defaulting on the mortgages, Shadowbrook, Naimi, DJS Enterprises, and Palm Beach Group Investment sued Transcapital, Himes, and Zedeck. In the operative complaint, all of the plaintiffs sued all the defendants for fraud (count I). Shadowbrook and Naimi also sued defendants Transcapital, Zedeck and Himes in the combined claim of conversion and civil theft (count II). All of the plaintiffs also sued all of the defendants for breach of fiduciary duty (count III).

2

The plaintiffs' fraud claim alleged that the plaintiffs were misled about the property's value and the existence of an appraisal allegedly valuing the property at over $90,000 per unit, when, according to the plaintiffs, the units were worth substantially less. The combined conversion and civil theft claim alleged that although an $8,500 appraisal fee was charged at the closing, no appraisal was performed. The breach of fiduciary duty claim alleged that the defendants owed the plaintiffs a fiduciary duty based on the parties' prior dealings in earlier transactions, and breached that fiduciary duty by misleading the plaintiffs into purchasing the 123 units.

After the plaintiffs sued the defendants, Transcapital counterclaimed to foreclose on the mortgages and recover on Naimi's personal guaranty.

*The Trial*

The case resulted in a multi-week jury trial on the plaintiffs' claims and Transcapital's counterclaim for Naimi's alleged breach of the guaranty. The court also agreed to simultaneously consider Transcapital's counterclaim to foreclose on the mortgages.

At trial, co-plaintiff Naimi testified that he had been building homes and investing in real estate for some time, and previously had obtained financing from Transcapital for his endeavors. In early 2008, Naimi was approached by Himes, with whom Naimi had prior dealings, about a "very interesting project in Vero Beach." Although Naimi was not interested at first, he viewed some of the units in the subject 164-unit condominium project and ultimately decided to go forward with the transaction.

Naimi testified Himes and Zedeck told Naimi that Transcapital was offering him a great deal and he would make a lot of money. The proposal was that Naimi, via Shadowbrook, would purchase 123 of the units, and Transcapital would retain twenty units. Zedeck previously had purchased five units from the prior owner at $95,000 per unit. The remaining units were owned by unrelated parties.

According to Naimi, during a meeting before the closing, Zedeck pointed to an unidentified paper and said that the property had been appraised for $14.8 million. Naimi testified that because the property was being offered to him at $10.9 million, he believed he had a "big cushion." Even though Naimi was represented by counsel who reviewed all of the closing documents before closing, Naimi testified he was never given a copy of the appraisal, and he signed the contract and closed the transaction without having received the appraisal or directing anyone to perform an appraisal.

3

On cross examination, Naimi admitted that although he was told the appraised value of the entire property was $14.8 million, he also was specifically shown two prior notes from the prior owner in the aggregate amount of $14.8 million, and the appraisal could have been for all 164 units. Naimi further admitted that because Shadowbrook was purchasing only 123 of the units, the price per unit worked out the same:

> DEFENSE COUNSEL: And the one page you looked at was a note for 14.8 million dollars, correct?
>
> NAIMI: Correct.
>
> DEFENSE COUNSEL: And that note for 14.8 million dollars is attached as Exhibit 1A, which is the membership purchase agreement and related documents that you signed on April 15, 2008, correct?
>
> NAIMI: Right.
>
> . . . .
>
> DEFENSE COUNSEL: . . . The note for 14.8 million represented the note on 164 units?
>
> NAIMI: I don't know sir.
> . . . .
>
> DEFENSE COUNSEL: Let's do some math here. If you take 14.8 million and you divide by 164, what do you get? Do you know?
>
> NAIMI: No, sir.
>
> DEFENSE COUNSEL: Okay. If you take 10.9 and you divide by 123, what do you get?
>
> NAIMI: 89,900.
>
> DEFENSE COUNSEL: Right. Which is just about what you get when you divide 14.8 by 164, right?
>
> NAIMI: I guess.

4

In fact, the $14.8 million in notes referenced above (two notes of $7.4 million each), which were shown to Naimi before the closing, were the notes signed by the prior owner for all 164 units of the property. Both of those notes, as well as all of the loan documents executed by the prior owner, were attached and made part of the Membership Purchase Agreement which Naimi signed.

Naimi admitted that he had every opportunity to consult with professionals before the purchase. Additionally, although Naimi had every opportunity to inspect all units prior to the closing, he inspected only a handful, some of which he noted were in "horrible condition" and unlivable, while others were just "okay."

Co-defendant Himes testified that the project's prior owner defaulted on its loans from Transcapital. Those loans were assumed by Shadowbrook, and all of the documentation concerning the assumed loans were attached to the Membership Purchase Agreement which Naimi signed. Himes also testified that he gave Naimi every appraisal which Transcapital had for the entire 164-unit project, including an appraisal for $16 million performed two years before the closing.

As for the $8,500 appraisal charge which Shadowbrook paid to Transcapital at the closing, Himes testified that the charge was a mistake. Himes testified that although an appraisal is usually required by a mortgagee on new loans, it was unnecessary here because Shadowbrook assumed an existing loan from the project's prior owner. Zedeck, who acted as the closing agent on the transaction, testified that he charged the $8,500 appraisal fee at closing at Transcapital's direction. Zedeck testified he was unaware that the appraisal had not been obtained. It was undisputed that neither Himes nor Zedeck received the $8,500 which was charged to Shadowbrook.

At the close of the plaintiffs' case, the defendants moved for directed verdict on all of the plaintiffs' claims. As to the plaintiffs' fraud claim, the defendants argued that property value is an opinion and an opinion cannot form the basis for a fraud claim. As to the plaintiffs' combined conversion and civil theft claim, the defendants argued, among other reasons, no evidence existed of criminal intent regarding the $8,500 charge at closing, these causes of action do not apply when the dealings are contractual, and, in any event, Himes and Zedeck did not receive the $8,500. As to the plaintiffs' breach of fiduciary duty claim, the defendants argued no evidence existed that the defendants were in a position of trust with the plaintiffs. The court reserved ruling on the motion for directed verdict.

5

Transcapital, as counterplaintiff, then presented its case for Naimi's breach of the guaranty. Naimi identified the $1 million guaranty, and testified that he signed it. He further testified that Shadowbrook failed to make payments on the loan and stopped paying real estate taxes on the property. Transcapital introduced into evidence a damage summary detailing all damages owed, included payments for principal and interest, real estate taxes, reimbursement for redemption of tax certificates, and insurance. Transcapital also introduced the notice of default.

Naimi's primary defense to the breach of guaranty counterclaim was that if the jury found fraud as alleged in the plaintiffs' claim, then the breach of guaranty counterclaim would not be enforceable.

After Transcapital rested and the plaintiffs presented rebuttal evidence, the defendants renewed their motion for directed verdict on the plaintiff's claims. Transcapital also moved for a directed verdict on its breach of guaranty counterclaim. The court reserved ruling on the motions.

The jury's verdict was mixed. On the plaintiffs' fraud claim, the jury found that the defendants committed fraud, but also found that the plaintiffs released the fraud claim (based on facts not pertinent to this opinion). On the plaintiffs' combined conversion and civil theft claim, the jury found for the plaintiffs. However, on the plaintiffs' breach of fiduciary duty claim, the jury found for the defendants. On Transcapital's counterclaim that Naimi breached his guaranty, the jury found for Transcapital.

### The Post-Trial Motions

After the trial, the defendants renewed all of their directed verdict motions made at trial.

On the plaintiffs' fraud claim, the defendants argued that representations of property value are considered "opinion" and thus are not representations of material fact necessary to support a fraud claim. The defendants further argued that, even if any of them had misrepresented the property's value, such a representation would not be actionable under the doctrine of caveat emptor, absent evidence that the defendants prevented the plaintiffs from examining the property themselves. The defendants further argued, in light of the jury's finding that the defendants did not breach a fiduciary duty to the plaintiffs, no special relationship existed which would make caveat emptor inapplicable.

6

On the plaintiffs' combined conversion and civil theft claim, the defendants argued: no evidence existed of felonious intent by any defendant; unsegregated funds cannot form the basis of conversion or civil theft; the failure to comply with a contract cannot form the basis of conversion or civil theft; and Himes and Zedeck were entitled to judgment because they did not receive the $8,500 charged for the appraisal at closing.

The plaintiffs filed their own post-trial motions, including a motion for new trial which primarily argued the court erred in allowing the jury to make a finding that the plaintiffs released their fraud claim.

The trial court denied all post-trial motions except for the plaintiffs' motion for new trial on the release of fraud argument, which the court granted. The court ruled that a new trial should be held not only on the plaintiffs' fraud claim and combined conversion and civil theft claim, but also on Transcapital's counterclaim against Naimi for breach of guaranty.

### *The Appeal*

This appeal followed. The defendants primarily argue the trial court erred in denying their motions for directed verdict as to the plaintiffs' fraud claim and combined conversion and civil theft claim. Our review is de novo. *See Kopel v. Kopel*, 2017 WL 372074 (Fla. Jan. 26, 2017) ("An order on a motion for directed verdict or for judgment notwithstanding the verdict is reviewed de novo.") (citation omitted).

We agree with the defendants that the trial court erred in denying their motions for directed verdict. We discuss our reasoning further below. The plaintiffs also filed a cross-appeal, which we conclude, without further discussion, lacks merit. Thus, this opinion shall discuss only our reasoning for why the trial court should have granted the defendants' motions for directed verdict on each of the plaintiffs' claims, which we address in turn.

### 1. *The Plaintiffs' Fraud Claim*

On the plaintiffs' fraud claim, because this was a commercial transaction, the doctrine of caveat emptor, or let the buyer beware, is applicable. *See Wasser v. Sasoni*, 652 So. 2d 411, 412 (Fla. 3d DCA 1995) ("[T]he doctrine of caveat emptor, or 'buyer beware,' is still the common law rule applied to purchasers of commercial property."). "This doctrine places the duty to examine and judge the value and condition of the property solely on the buyer and protects the seller from liability for any

defects." *Turnberry Court Corp. v. Bellini*, 962 So. 2d 1006, 1007 (Fla. 3d DCA 2007) (citation omitted).

"Exceptions [to the doctrine of caveat emptor] arise: 1) where some artifice or trick has been employed to prevent the purchaser from making independent inquiry; 2) where the other party does not have equal opportunity to become apprised of the fact; and, 3) where a party undertakes to disclose facts and fails to disclose the whole truth." *Green Acres, Inc. v. First Union Nat'l Bank of Fla.*, 637 So. 2d 363, 364 (Fla. 4th DCA 1994) (citation omitted).

We conclude that, applying the doctrine of caveat emptor to this transaction, the plaintiffs' fraud claim could not survive a motion for directed verdict. None of the exceptions to caveat emptor apply. Shadowbrook, through Naimi, admitted that he had every opportunity to consult with professionals before the purchase. Shadowbrook also had a full and fair opportunity to investigate all aspects of the property, including its value. For example, although Naimi had the opportunity to inspect all units before the closing, he inspected only a handful, some of which he noted were in "horrible condition" and unlivable, while others were just "okay." Based on these observations, Shadowbrook could have obtained its own appraisal. Instead, Shadowbrook closed on the transaction knowing that it had not received a copy of any appraisal, and had not viewed a copy of the appraisal which Naimi alleged was referred to during the negotiations.

The case upon which the plaintiffs primarily rely, *Najera v. NationsBank Trust Co.*, 707 So. 2d 1153 (Fla. 5th DCA 1998), is distinguishable based on its contrasting procedural posture to this case. *Najera* came to our sister court on appeal from an order granting the lender's motion for summary judgment where the borrower had raised a defense of fraudulent inducement. *Id.* at 1155. Our sister court reversed because "the allegations and record create[d] issues of fact concerning whether [the borrowers] relied upon the existence of a professional appraisal to support the loan values, and whether they would have entered into this transaction had those representations not been made." *Id.* Similarly here, a genuine issue of material fact existed before trial as to whether the defendants misrepresented the existence of an appraisal.

But a motion for directed verdict goes beyond whether a genuine issue of material fact exists. "A trial court should grant a motion for directed verdict when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ about the existence of a material fact and the movant is entitled to judgment as a

8

matter of law." *Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009) (citation omitted).

Here, the defendants were entitled to a judgment as a matter of law on the plaintiffs' fraud claim. Even if any of the defendants had misrepresented the property's appraised value, such a misrepresentation would not be actionable under the doctrine of caveat emptor in the absence of evidence that the defendants resorted "to some fraudulent means in preventing a prospective purchaser from making an examination of the property under consideration." *Farnham v. Blount*, 11 So. 2d 785, 790 (Fla. 1942) (citation omitted). The plaintiffs presented no such evidence here.

Although an exception exists to the foregoing where the seller has a fiduciary duty to the buyer and breached that duty, *see Glass v. Craig*, 91 So. 332, 335 (1922), that exception does not apply here. In this case, the jury found in the defendants' favor on the plaintiffs' breach of fiduciary duty claim.

In addition to the foregoing, the evidence presented at trial belied the plaintiffs' allegation that the defendants had misrepresented the property's appraised value. On cross examination, Naimi admitted that although he was told the appraised value of the entire property was $14.8 million, he also was specifically shown two prior notes from the prior owner in the aggregate amount of $14.8 million, and the appraisal could have been for all 164 units. Naimi further admitted that because Shadowbrook was purchasing only 123 of the units, the price per unit worked out the same.

In fact, the $14.8 million in notes referenced above (two notes of $7.4 million each), which were shown to Naimi before the closing, were the notes signed by the prior owners for all 164 units of the property. Both of those notes, as well as all of the loan documents executed by the prior owners, were attached and made part of the Membership Purchase Agreement which Naimi signed.

Based on the foregoing, the defendants were entitled to a directed verdict on the plaintiffs' fraud claim.

### 2. *The Plaintiffs' Combined Conversion and Civil Theft Claim*

On the plaintiffs' combined conversion and civil theft claim, the defendants also were entitled to judgment as a matter of law for four reasons.

First, "an action for conversion of money can only be maintained where the money at issue has been kept separate." *Rupp v. Schon*, 608 So. 2d 934, 935 (Fla. 4th DCA 1992) (citation omitted). Here, the $8,500 for the appraisal was paid in a check with other closing funds, and the plaintiffs presented no evidence that the $8,500 was kept separate from the other closing funds.

Second, for a viable claim to exist for conversion or civil theft when the parties have a contractual relationship, "the civil theft or conversion must go beyond, and be independent from, a failure to comply with the terms of a contract." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (citation omitted). Here, the plaintiffs presented no evidence of any action which went beyond, or was independent from, the contract. The plaintiffs merely contended that they were charged for an appraisal which they did not receive, which would be nothing more than a breach of contract.

Third, "[t]o establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." *Heldenmuth v. Groll*, 128 So. 3d 895, 896 (Fla. 4th DCA 2013) (citation omitted). Such intent must be proven by clear and convincing evidence. *Westinghouse Elec. Corp. v. Shuler Bros., Inc.*, 590 So. 2d 986, 988 (Fla. 4th DCA 1991). Here, the plaintiffs presented no evidence of any criminal intent of the defendants, much less clear and convincing evidence of any such intent. Instead, the evidence showed that charging $8,500 for a non-existent appraisal, as part of a $10.9 million transaction, was more likely a mere mistake.

Fourth, a party which does not personally receive property which is the subject of an alleged conversion or civil theft cannot be held liable for such action. *See Rupp*, 608 So. 2d at 935 (even if the plaintiff had a valid claim for conversion, such claim could be asserted against only the corporation which received the plaintiff's property, not the individual who was the corporation's sole shareholder, because the individual did not personally receive the property). Here, the evidence showed that only Transcapital received the $8,500 at issue. The plaintiffs presented no evidence that Himes or Zedeck personally received the $8,500 at issue. Although Zedeck had temporary possession of the $8,500 as the escrow agent, an escrow agent can be responsible for conversion only if the escrow agent has put some of the escrowed funds towards personal use. *Cf. Heldenmuth*, 128 So. 3d at 896-97 (purchaser of real property stated a claim for civil theft against escrow agents by alleging that escrow agents used some of the escrow funds which the purchaser delivered solely to purchase real property for the escrow agents' own use). The plaintiffs presented no

evidence that Zedeck put any of the $8,500 towards personal use. Thus, both Himes and Zedeck were entitled to a directed verdict on the combined conversion and civil theft claim.

*Conclusion*

Given that the defendants were entitled to directed verdicts on the plaintiffs' fraud claim and combined conversion and civil theft claim, no justification exists for a new trial on Transcapital's counterclaim against Naimi for breach of the guaranty. The amount due on the counterclaim was undisputed, Transcapital proved the default, and no trial errors occurred in connection with the counterclaim.

The plaintiffs' only argument in defense of the guaranty was that if the plaintiffs committed fraud, then it would negate the guaranty. However, because a directed verdict was proper on the plaintiffs' fraud claim, Transcapital is entitled to judgment on Naimi's breach of the guaranty, including interest from the date of default when Shadowbrook stopped paying down the loan and stopped paying real estate taxes.

Based on the foregoing, we reverse the trial court's order granting the plaintiffs' motion for new trial on the plaintiffs' fraud count and combined conversion and civil theft count. We remand for entry of a directed verdict and final judgment in the defendants' favor on both counts. We also remand for entry of final judgment in Transcapital's favor on Transcapital's counterclaim against Naimi for breach of his guaranty. Finally, although the trial court did not render judgment on Transcapital's foreclosure counterclaims which the court considered non-jury, we would expect that, consistent with our conclusions, the trial court will enter final judgment in Transcapital's favor on Transcapital's foreclosure counterclaims against Shadowbrook and Naimi.

*Reversed and remanded for proceedings consistent with this opinion.*

DAMOORGIAN, J., concurs.
CIKLIN, J., concurs in part and dissents in part with opinion.

CIKLIN, J., concurring in part and dissenting in part.

I concur in the majority's determination that the trial court erred in not entering a directed verdict on the conversion and civil theft claims. Otherwise, I respectfully dissent.

11

This appeal arises from the trial court's grant of new trial based in part on its determination that the jury arrived at an improper compromise verdict. Indeed, the verdict form gave rise to a suggestion of compromise: the jury awarded damages on Naimi's fraud claim even though the jury found in favor of the defense by accepting an affirmative defense it had raised. The amount awarded was almost equal to the award on Transcapital's breach of guaranty counterclaim, after the jury inexplicably found the default date on the guaranty was the date of trial, thus removing the need to award prejudgment interest.

"When reviewing the order granting a new trial, an appellate court must recognize the broad discretionary authority of the trial judge and apply the reasonableness test to determine whether the trial judge committed an abuse of discretion." *Thigpen v. United Parcel Servs., Inc.*, 990 So. 2d 639, 644 (Fla. 4th DCA 2008) (quoting *Brown v. Estate of A.P. Stuckey*, 749 So. 2d 490, 497-98 (Fla. 1999)). "Moreover, a stronger showing has usually been required to reverse an order allowing a new trial than to reverse an order denying a motion for new trial." *Id.* at 645. Based on the verdict form and the record as a whole, I find it difficult to conclude that the trial court abused its discretion in granting a new trial based on improper jury compromise. *See Street v. H.R. Mortg. & Realty Co.*, 949 So. 2d 1158, 1162 (Fla. 4th DCA 2007) (recognizing that "case law does not require actual proof that the jury *did* compromise its verdict," and that it is enough if there is "'some suggestion' that the jury may have compromised on the verdict in light of the 'hotly contested evidence of liability' and the jury's decision to give just a small award of damages" (citation omitted)).

Against this backdrop, I respectfully dissent with respect to Naimi's fraud claim. The crux of his claim was that the defendants tricked him by charging him and collecting payment for an appraisal that was never performed, and then by asserting that this nonexistent appraisal valued the property Naimi was purchasing at more than $14.8 million, much more than its worth.

I believe there was minimally sufficient evidence for the jury to determine the merits of the claim. Naimi testified that after decades in the nightclub business, he became involved in real estate investing in 2001. He began by purchasing lots for the construction of single-family homes. In 2005, he obtained financing for construction of four of the homes from Transcapital after meeting with Himes. Around the same time, Himes and Zedeck assisted him in obtaining a loan from Transcapital for DJS Enterprises to purchase a home in Palm Beach County. In 2007, Naimi obtained financing from Transcapital in relation to three parcels of land owned by DJS Enterprises. He did not have representation at any of the

closings related to the purchases by DJS Enterprises; instead, Zedeck handled all of the closing documents.

Naimi testified that in 2008, Himes suggested that Naimi take a look at the condominium in Vero Beach. Naimi was not interested but Himes called him repeatedly. After touring the property, Naimi met with Himes and Zedeck. Himes and Zedeck represented that they were going to "keep" twenty condominium units "for [Transcapital]," that Zedeck would "have five unit[s] himself," and that Transcapital and Naimi would essentially be involved in a "partnership" and "make a lot of money together." Naimi testified that Zedeck told him the appraisal for 123 units came in at more than $14.8 million. There was no such appraisal and it was undisputed that an appraisal was never performed even though Naimi was required to pay for an appraisal.

The majority contends that the principles of caveat emptor apply in this matter and Naimi therefore is without recourse. In my opinion, the evidence was sufficient for the jury to determine whether "some artifice or trick has been employed to prevent the purchaser from making independent inquiry." *Green Acres, Inc.*, 637 So. 2d at 364. Here, there was evidence that Himes and Zedeck indicated they were also investing in the property, that they were all going to make a lot of money together, and that Zedeck represented that 123 units were appraised at more than $14.8 million, well over their true worth. This evidence, coupled with evidence that Transcapital collected an appraisal fee from Naimi even though no appraisal was ever performed, was more than sufficient for the jury to determine the merits of the fraud claim.

The majority also asserts that any evidence of a fiduciary relationship between the parties could not be considered by the trial court in determining the motion for directed verdict on the fraud claim because, the majority reasons, the jury found for the defense on the breach of fiduciary duty count. I disagree.

The trial court, being in the front row of the courtroom, was in the best position to determine if the jury's entire verdict could not stand, in light of its finding of an improper jury compromise. Accordingly, the trial court was free to consider the evidence related to a fiduciary relationship between the parties in determining whether it should grant a directed verdict on the fraud count. The majority usurps the trial court's broad authority and discretion to act as it did. The trial court was in a superior position to determine if a new trial was warranted in this case and that is precisely what it concluded. I would not undercut the trial court's prerogative in that regard and therefore I respectfully dissent.

13

\*  \*  \*

*Not final until disposition of timely filed motion for rehearing.*