DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**UNIVERSAL PROPERTY & CASUALTY INSURANCE COMPANY,**
Appellant,

v.

**JORGE MARTIN CABOVERDE** and **YUSMILA GONZALEZ,**
Appellees.

No. 4D22-1059

[June 28, 2023]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos A. Rodriguez, Judge; L.T. Case No. CACE17-011762 (14).

Elizabeth K. Russo of Russo Appellate Firm, P.A., Miami, and Bernstein, Chackman, Liss, Hollywood, for appellant.

Marcela Irimiea of Law Offices of Marcote & Marcote De Moya, PLLC, Miami, and Mariano Gonzalez of Gonzalez Legal, P.A., Sunrise, for appellees.

GERBER, J.

In this first-party homeowners' insurance dispute involving two insurance claims—a 2016 ceiling collapse claim, and a 2019 Hurricane Irma claim—the insurer appeals from the circuit court's final judgment following a jury verdict in the homeowners' favor on both claims. The insurer argues the circuit court erred in denying its motions for directed verdict and judgment notwithstanding the verdict based on the homeowners' failure to meet their burden of proof on each claim.

On the 2016 ceiling collapse claim, we conclude that even if the homeowners met their burden of proving a ceiling "collapse" had occurred—as that term is defined in the policy—the homeowners did not meet their burden of proving hidden and unknown decay or insect damage had caused the ceiling collapse, as the policy required. Thus, we reverse the circuit court's final judgment in the homeowners' favor on that claim, and remand for a final judgment in the insurer's favor on that claim.

On the 2019 Hurricane Irma claim, we conclude the homeowners met their burden of proof to support the jury's verdict. Accordingly, we affirm the circuit court's final judgment on that claim.

We write to provide our reasoning on only the 2016 ceiling collapse claim. We will present this opinion in three sections:

1. The relevant policy provisions;
2. The circuit court proceedings; and
3. This appeal.

## 1. *The Relevant Policy Provisions*

The homeowners' policy provided coverage for losses involving collapse of a building or part of a building "caused by one or more" of six listed perils, including hidden and unknown decay and insect damage:

8. Collapse

a. With respect to this Additional Coverage:

(1) *Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building, or part of the building, cannot be occupied for its intended purpose.*

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b. *We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following*:

2

(1) Perils Insured Against in Coverage C Personal Property. These perils apply to covered buildings and personal property for loss insured by this additional coverage;

*(2) Decay that is hidden from view, unless the presence of such decay is known to [the homeowners] prior to collapse;*

*(3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to [the homeowners] prior to collapse.*

(4) Weight of contents, equipment, animals or people;

(5) Weight of rain which collects on a roof; or

(6) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

(emphases added).

## 2. *The Circuit Court Proceedings*

The homeowners filed their original complaint against the insurer for declaratory relief regarding their ceiling collapse claim. The homeowners later successfully sought leave to amend their complaint.

The insurer filed an answer and affirmative defenses to the amended complaint. The insurer's answer and affirmative defenses essentially denied the homeowners' allegations that they were entitled to coverage for what the insurer referred to as the homeowners' ceiling "crack" claim.

At trial, the homeowners called several witnesses in their case-in-chief, including their pre-purchase home inspector, the husband homeowner, their public adjuster, and their contractor expert. After the homeowners rested, the insurer moved for a directed verdict on the homeowners' ceiling collapse claim. The circuit court reserved ruling. The insurer called its field adjuster as a witness in its case-in-chief. In rebuttal, the homeowners called their engineer expert as a witness. At the close of the evidence, the insurer renewed its directed verdict motion, on which the circuit court also reserved ruling. After the jury verdict in the homeowners' favor, the insurer filed a motion for judgment notwithstanding the verdict based on its directed verdict arguments. The circuit court denied that motion. We now provide more detail on these proceedings.

### a. The Homeowners' Pre-Purchase Home Inspector

The homeowners' pre-purchase home inspector testified as follows. In December 2015, he inspected the home for wood destroying organisms ("WDO")—for example, termites. His report reflected that no WDO were found, dead or alive, and "[t]he only area … with previous [WDO] evidence was [f]ront fascia by the entry door … probably residues of previous infestations." The report also noted WDO damage was observed on "two trusses … touching the ground in the back (covered patio)." Both of these areas were located on the home's outside.

The home inspector also inspected the roof. He opined that the five-to-seven-year-old roof was in "really good" condition, and should last "another 15 years." He then went inside the attic and checked the roof's decking, and then checked the ceilings. His inspection did not reveal any attic or ceiling issues, nor any WDO in those areas.

### b. The Husband Homeowner

The husband homeowner testified as follows. The homeowners moved into the home in February 2016. The pre-purchase inspection did not require any roof or home interior repairs.

In September 2016, approximately seven months after the homeowners had moved into the home, the living room ceiling "collapsed" by two or three inches. The next day, the homeowners self-installed a wooden post to support the ceiling. In order to install the post, the homeowners had to use the post to "push up" the ceiling. The following day, the homeowners reported their ceiling collapse claim to the insurer. Over the next month, the living room ceiling's collapse continued in different areas. The homeowners installed five additional posts in the living room. One area required a larger piece of wood, "[b]ecause the ceiling collapsed [to the ground]. It had a big hole." The homeowners were no longer able to occupy the living room area because of the risk.

On cross-examination, the husband homeowner testified they did not hire a pest control service, because they never saw any termite damage.

### c. The Homeowners' Public Adjuster

The homeowners' public adjuster testified as follows. In September 2016, his company reported the homeowners' claim to the insurer, and soon thereafter he met with the insurer's field adjuster at the home. Later,

the insurer denied the claim. The insurer found the damage was caused by "settlement." According to the homeowners' public adjuster, "no evidence of that [existed] whatsoever." The public adjuster explained: "You see settlement on the outside of the homes, where you see cracks in stucco. None of that was present in this house."

On cross-examination, the public adjuster testified that the homeowners never presented a termite damage claim to the insurer.

*d. The Homeowners' Contractor Expert*

The homeowners' contractor expert testified as follows. He inspected the home one time, in June 2021—which was nearly five years after the homeowners had reported their ceiling collapse claim. In June 2021, the contractor expert testified, he found "termite damage" and "termite infestation" to the wood trusses.

On cross-examination, the contractor expert testified he was not a termite expert, and he could not speak to how long the termites were in the home, or the rate at which termites can cause damage.

*e. The Insurer's Directed Verdict Motion*

After the homeowners rested, the insurer moved for a directed verdict on the homeowners' ceiling collapse claim, arguing the homeowners had not presented prima facie evidence to show that a "collapse" had occurred under the policy's collapse coverage provision, or that hidden and unknown decay or termite damage had caused the alleged collapse.

In response to the insurer's motion, the circuit court had the following discussion with the homeowners' counsel regarding the lack of evidence that termites were present in September 2016 when the collapse occurred:

> COURT: You have to have evidence to [show] that [termites existed at the time of the alleged collapse]. You don't have any evidence [termites] were in those beams back in [September] 2016, that's what's missing.
>
> HOMEOWNERS' COUNSEL: No, but, but there's evidence that there was hidden damage underneath the insulation for which we believe a jury could reasonably find.
>
> COURT: But that was in 2021, not in 2016, that's five years later. …

You ... have to have some evidence that there was termite damage in the area when there was a collapse prior to or at the time of the 2016 collapse. ... [T]here's none. ...

Despite the foregoing discussion, the circuit court reserved ruling on the insurer's directed verdict motion.

### f. The Insurer's Field Adjuster

The insurer's field adjuster testified as follows. In September 2016, he met with the homeowners' public adjuster to inspect the home. The inspection revealed the home's interior walls and ceiling all were standing. The ceiling contained cracks, but no pieces of the wall or ceiling were laying on the ground. In the living room, the homeowners had "shored up" the ceiling in one area only. One bedroom displayed "cracking to the ceiling" as well.

Based on the inspection, the insurer issued a denial letter citing the policy's coverage exclusion "for damage arising out of normal wear and tear [and] settlement, including resultant cracking of foundations walls, floors, roofs, or ceilings."

### g. The Homeowners' Engineer Expert

In rebuttal, the homeowners called their engineer expert to testify. However, the homeowners' engineer expert did not testify about termite damage or other causation for the ceiling collapse. Instead, the homeowners' engineer expert testified only to having taken various moisture readings within the home.

### h. The Insurer's Renewed Directed Verdict Motion

At the close of the evidence, the insurer renewed its directed verdict motion on the ceiling collapse claim. The insurer argued the homeowners failed to prove either that: (1) a "collapse" had occurred pursuant to the policy's additional coverage for collapse (section 8.a.); or (2) hidden and unknown decay or insect damage had caused any collapse (section 8.b.):

> [W]e spent a lot of time talking about whether it's a collapse or not [under subsection 8.a.], but we didn't talk about sub[section] [8.b.], which is ... a problem for [the homeowners]. ....

6

... [T]o recover, if it is a collapse, which I'll get to next, it has to meet one of ... six [named perils] ... It's [the homeowners'] burden ... to prove ... one of those [named perils] [in] [subsection 8.b.(1)] through [8.b.(6)]. ...

I don't know if the[] [homeowners are] arguing that decay caused the collapse [under subsection 8.b.(2)] ... [or if] they're going to try to argue termites caused the collapse [under subsection 8.b.(3),] that it was hidden from view. ... [The homeowners' counsel] has no evidence or proof that termite damage caused the collapse. ...

The homeowners' counsel responded that the homeowners were "claiming [coverage] under [subsection 8.b.(2),] decay, ... that is ... hidden from [view, and was unknown to the homeowners,] based on the testimony of [the contractor expert]." The following discussion then occurred:

COURT: [T]he problem with the decay issue is there's no decay in the photographs that were taken at or about the time of the initial cracks that were presented [in September 2016]. Yes, in 2021, th[e] interior of that roof looks like the whole thing is going to collapse, the wood thing, you know, put your fingers through it. There's all kinds of termites ... all kinds of ro[t] in there. There's all kinds of problems in 2021. But as far as whether anything like that was in there [in September 2016, when the collapse claim was reported], the evidence ... shows supports that are ... intact above the roof. They don't show any decay. They don't show any termite damage. That's the problem.

HOMEOWNERS' COUNSEL: Well, it was testified to by [the contractor expert] that there was decay. I don't think the right term line is trusses, but whatever beams hold the ceiling to the underlying beams that there was decay there that's clearly what happened here. ...

INSURER'S COUNSEL: ... [B]ut he's a general contractor ..., and he also testified that he couldn't go in the attic to see because it was unstable. ... [The homeowners] ha[ve] to prove that there was a collapse and that it was caused by something. ...

The insurer's counsel then argued that the homeowners' pre-purchase inspector's testimony—about previous termite damage being found in the

7

front fascia by the entry door and on the two trusses touching the ground by the back covered patio—did not show what caused the living room ceiling damage.

The circuit court again reserved ruling on the insurer's directed verdict motion.

### i. *The Jury Verdict, the Insurer's JNOV Motion, and the Final Judgment*

After closing arguments, the jury returned the following verdict in the homeowners' favor on their ceiling collapse claim:

> 1. Did [the homeowners] … establish by the greater weight of the evidence that decay or termite damage caused a "Collapse" of a part of their property, as that term is defined by the policy, on September 5, 2016?
>
> YES __√__      NO _____
>
> If your answer is "YES," please proceed to the next question.
>
> 2. Did [the homeowners] establish by the greater weight of the evidence that the decay or termite damage was hidden from view and that the presence of said decay or termite damage was not known to them prior to the "Collapse"?
>
> YES __√__      NO _____

The insurer filed a motion for judgment notwithstanding the verdict. The insurer again argued the homeowners had not presented evidence to support the jury's findings, including that hidden and unknown decay or termite damage had caused the alleged ceiling collapse.

Despite the circuit court's previous comments during the trial regarding the homeowners' lack of causation evidence to support their ceiling collapse claim, the circuit court entered an order denying the insurer's JNOV motion, followed by a final judgment in the homeowners' favor.

### 3. *This Appeal*

This appeal followed. The insurer summarizes its argument, in pertinent part, as follows:

8

> [The homeowners] had the burden not only of proving a collapse as defined by the [p]olicy terms, but also that the collapse was caused by one of the named perils listed in the collapse provision. [The homeowners] attempted to assert that the named perils of termite damage or decay caused the conditions existing on September 5, 2016. But [the homeowners never presented any evidence (1) that termite damage or decay were even present in the property in 2016, or (2) that termite damage or decay **caused** the ceiling [collapse] that [they] observed on September 5, 2016.
>
> …
>
> Based on the [p]olicy terms and the trial evidence, [the homeowners] were not entitled to a declaration that they had a loss covered by the [p]olicy's collapse coverage. The declaration in the final judgment that [the homeowners] were entitled to collapse coverage should be reversed.

The homeowners respond, in sum:

> [T]he jury heard competent, substantial evidence on … the collapse … claim[] and reached their verdict. The jury found that, on the collapse claim, hidden decay and/or hidden termites caused the collapse of part of the [homeowners'] residence on September 5, 2016[,] and that the collapse is covered under the policy with [the insurer] resulting in a declaratory judgment for [the homeowners]. … The record shows that a reasonable view of the evidence could sustain a verdict in [the homeowners'] favor … on [their collapse] claim[].

Applying de novo review, we agree with the insurer's argument. *See Kopel v. Kopel*, 229 So. 3d 812, 819 (Fla. 2017) ("An order on a motion for directed verdict or for judgment notwithstanding the verdict is reviewed de novo."). The circuit court should have granted the insurer's motion for judgment notwithstanding the verdict on the ground that the homeowners had not presented evidence that unknown or hidden decay or termite damage had caused the alleged ceiling collapse in September 2016.

"A trial court should grant a motion for directed verdict when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ about the existence of a material fact and the movant is entitled to judgment as a matter of law."

9

*Transcapital Bank v. Shadowbrook at Vero, LLC*, 226 So. 3d 856, 863 (Fla. 4th DCA 2017) (citation omitted).

Here, the homeowners failed to prove the ceiling collapse was caused by a named peril within the policy. Additional Coverage 8 provided coverage for losses involving collapse of a building or part of a building caused only "by one or more" of a list of perils, including hidden and unknown decay; hidden and unknown insect damage; weight of contents, equipment, animals or people; weight of rain which collects on a roof; or use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

The homeowners attempted to assert only hidden and unknown decay and insect damage as the named perils which caused the alleged collapse in September 2016. However, the homeowners never presented any evidence that hidden and unknown decay or insect damage had been present in the home in September 2016, and thus could not have proven that hidden and unknown decay or insect damage had caused the alleged ceiling collapse in September 2016.

The only witness who testified about termite damage inside the home was the homeowners' contractor expert, who did not inspect the home until June 2021—almost five years after the alleged ceiling collapse. Further, the contractor expert admitted he was not a termite expert, and while he "would suspect that takes many, many months to get to th[e] type of decay" which he found in the instant home, he "just [did not] know how long the[] [termites] ha[d] been there, nor did [he] test the house for termites."

As the circuit court later instructed the homeowners' counsel:

> [T]he problem with the decay issue is there's no decay in the photographs that were taken at or about the time of the initial cracks that were presented [in 2016]. Yes, in 2021, th[e] interior of that roof looks like the whole thing is going to collapse, the wood thing, you know, put your fingers through it. There's all kinds of termites … all kinds of ro[t] in there. There's all kinds of problems in 2021. But as far as whether anything like that was in there [in September 2016, when the collapse claim was reported], the evidence … shows supports that are … intact above the roof. They don't show any decay. They don't show any term[ite] damage. That's the problem.

Although we appreciate that the circuit court, in an abundance of caution, may have reserved ruling on the insurer's directed verdict motions in order to obtain the jury's verdict on the homeowners' ceiling collapse claim for appeal purposes, the circuit court erred in not granting the insurer's motion for judgment notwithstanding the verdict on that claim based on the circuit court's earlier-expressed observations.

## *Conclusion*

Based on the foregoing, the insurer was entitled to final judgment in accordance with its directed verdict motions and motion for judgment notwithstanding the verdict on the homeowners' 2016 ceiling collapse claim. Accordingly, we reverse the circuit court's final judgment in the homeowners' favor on that claim, and remand for a final judgment in the insurer's favor on that claim. Further, as stated above, we affirm the circuit court's final judgment in the homeowners' favor on their 2019 Hurricane Irma claim, without further discussion.

*Affirmed in part, reversed in part, and remanded with instructions.*

WARNER and MAY, JJ., concur.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***