# United States Court of Appeals
## For the First Circuit

Nos. 24-1532, 24-1614, 24-1734

WAYNE ORKIN,

Plaintiff, Appellant,

ARTHUR ORKIN,

Plaintiff,

v.

LISA SUE ALBERT; IAN ALBERT,

Defendants, Appellees,

BOOST WEB SEO, INC.,

Third Party Plaintiff, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Margaret R. Guzman, U.S. District Judge]

Before

Montecalvo, Lynch, and Kayatta,
Circuit Judges.

Jason Tauches for appellant.
Irwin Schwartz, with whom BLA Schwartz PC was on brief, for
appellees.

December 11, 2025

**KAYATTA**, **Circuit Judge**.  These consolidated appeals arise out of disputes between two siblings, Wayne Orkin and Lisa Albert, concerning a business they conducted under the name of Boost Web SEO, Inc.  Created and operated without the benefit of completed corporate formalities or even rudimentary written agreements as to roles and responsibilities, Boost Web served largely as a name under which the two siblings conducted commerce pursuant to terms defined largely by their conduct over the course of more than a decade.  Now, likely to their respective detriment, both sides find themselves in no-holds-barred litigation to resolve their current family dispute.  The district court made much headway in trying to fit the parties' square-pegged conduct into the round holes of the legal theories they have put forward. We now affirm in part and vacate in part the district court's judgment, with further guidance for completing the job on remand.

**I.**

**A.**

The following facts are not contested on appeal.  Working from the Dominican Republic, Orkin owned and operated a business known as Pass Thru Merchant Services (PTMS).  In 2011, PTMS entered into an independent contractor agreement with CardConnect, then known as Financial Transaction Services, LLC, a company in the

business of providing credit card processing services.[1]  Through PTMS, Orkin agreed to help solicit and develop new customers for CardConnect.  In return, CardConnect agreed to pay PTMS eighty percent of CardConnect's net income attributed to payment from companies that PTMS solicited, or "originated."  The parties refer to those payments as "residuals."

Boost Web was formed in 2013 when Orkin, still working from the Dominican Republic, needed a United States corporation to facilitate his work with PTMS on behalf of CardConnect.  At Orkin's request, Albert incorporated Boost Web in Florida in 2013, listing herself on the articles of incorporation as the registered agent, incorporator, and sole "initial officer(s) and/or director(s)."  From that point on, as the district court found, Orkin "ran all of the day-to-day business affairs of Boost Web" and "generated all of [its] business," managing relationships with merchants whose transactions he originated, providing customer service, and interacting with CardConnect.  Orkin v. Albert, 729 F. Supp. 3d 194, 214 (D. Mass. 2024).  Orkin also "held himself out publicly" as Boost Web's president, including in his email signature block. Id. at 203.

---

[1]  The company rebranded as CardConnect in 2013.  Throughout this opinion, we refer to the company, both before and after the rebrand, as CardConnect.

Albert nevertheless continued to be listed as the "current registered agent" and "officer/director" of Boost Web on its filings with the Florida Secretary of State each year. Albert also opened Boost Web's bank account, providing both herself and Orkin with signature authority. And she provided Orkin with her personal credit card to use for Boost Web expenses.

Boost Web never issued any stock and has not at any point had shareholders; no president or officers were ever elected. There was also no express agreement as to profit-sharing or compensation for either Albert or Orkin.

In a 2011 agreement between CardConnect and PTMS, CardConnect agreed to pay certain residuals to PTMS. In January 2014, PTMS, CardConnect, and Boost Web altered that arrangement by entering into an agreement titled the Consent to Assignment Agreement ("Consent Agreement"). The 2014 Consent Agreement confirmed CardConnect's consent to PTMS assigning its rights to those residuals to Boost Web rather than PTMS. Leith Yaldoo, a friend of Orkin's who was affiliated with CardConnect, signed on behalf of CardConnect; Orkin also signed without indicating whether he was doing so on behalf of PTMS or Boost Web.

During the ensuing seven years, until April 2021, CardConnect transferred to Boost Web all residuals that arose from all merchant accounts originated both before and after the effective date of the 2014 Consent Agreement. By 2021, the

residual payments to Boost Web amounted to approximately $35,000 to $50,000 a month.

In April 2021, the familial and business relationship between Albert and Orkin took a rapid nosedive. Albert received a notification that her personal credit card had exceeded the credit limit and was running a balance of about $26,000. She also received a notice that the Boost Web bank account was overdrawn. In response, she terminated Orkin's signature authority on Boost Web's bank account as well as his access to her personal credit card. Then, on April 29, 2021, she sent an email to CardConnect identifying herself as president of Boost Web and stating the following:

> We have been experiencing fraudulent activities with a Wayne Orkin, who may have attempted to either access, change, or otherwise alter any arrangements between you . . . and Boost Web SEO.
>
> This is currently a civil and criminal matter that is being pursued.
>
> Wayne Orkin is not an authorized representative of Boost Web SEO and any such attempted activity by him will be further pursued in court.

Newly deprived of his access to Boost Web funds, Orkin took steps to ensure that, in his words at trial, "Boost would not receive the revenues" from CardConnect. On behalf of PTMS, he executed an agreement with CardConnect redirecting any yet-to-be-conveyed residuals purportedly owed to Boost Web under

the Consent Agreement to yet a different company, MKY FTS Sales, LLC (MKY).[2] MKY was then owned by Orkin's friend Yaldoo. Pursuant to that agreement, titled the Residual Redirection Application and Agreement ("Redirection Agreement"), CardConnect began redirecting residuals away from Boost Web to MKY. Upon MKY's receipt of the funds, Yaldoo then transferred them to a personal account controlled by Orkin.

The situation escalated from there. On May 28, 2021, Orkin and his father, Arthur Orkin,[3] filed a lawsuit in state court against Albert and her son, Ian Albert, seeking monetary damages and injunctive relief on various state-law claims related for the most part to the events described above. Meanwhile, the cessation of residual deposits flowing into Boost Web's bank account prompted Albert to repeatedly email CardConnect to inquire about the missing payments. And on August 24, 2021, counsel for Boost Web sent a letter to CardConnect's parent company "asserting Boost Web's entitlement to the residuals and noting 'what appears to be troubling conduct by certain employees at CardConnect[] in

---

[2] Orkin apparently first instructed CardConnect to redirect the residuals away from Boost Web on May 21, 2021, and ultimately signed the agreement on June 3, 2021.

[3] Later in 2021, Arthur Orkin passed away, and his distinct claims were subsequently dismissed for failure to substitute a party.

supporting redirection of funds from Boost Web by a former salesman, Wayne Orkin.'"

In response, CardConnect stopped redirecting residuals to MKY and instead began holding them in escrow. As of November 10, 2023, CardConnect held $943,557.97 in residuals in escrow.

Against this backdrop, conflict also arose over Orkin's expenses in Boost Web's name. In previous years, Orkin had used Boost Web funds for both business and personal expenses. Then, when it came time to do Boost Web's taxes, accountants would reconcile the company's checkbooks and accounts and work with Orkin to differentiate between his business and personal expenses. If the accountants had questions, they would request receipts from Orkin as documentation. However, problems arose in 2020 and 2021 (up until Orkin's access to Boost Web funds was cut off in April 2021). In both years, accountants requested receipts from Orkin to document his use of Boost Web funds and establish which expenses were business and which were personal; however, Orkin did not provide such documentation in the form sought by the accountants. Boost Web accountants nevertheless issued Form 1099s to Orkin in 2020 and 2021 reflecting that Orkin expended a cumulative $403,827.91 of Boost Web funds for which he could document no Boost Web expense.

We now turn to the similarly labyrinthine procedural history of this case.  As stated above, on May 28, 2021, Orkin and his now-deceased father filed this lawsuit in Massachusetts Superior Court against Albert and her son, alleging state-law claims of defamation, breach of fiduciary duty, breach of contract, unjust enrichment, and intentional interference with an advantageous business relationship.  Albert then removed the case to the U.S. District Court for the District of Massachusetts.  Boost Web successfully intervened and filed a crossclaim against Orkin.  After all parties moved for partial summary judgment, the district court granted in part and denied in part the motions, leaving only Orkin's defamation, breach of fiduciary duty, breach of contract, unjust enrichment, and injunctive relief claims against Albert and her son, as well as Boost Web's conversion crossclaim against Orkin.

The parties consented to a bench trial on these surviving claims.  On April 11, 2024, after the trial's conclusion, the district court issued a memorandum of decision on Orkin's claims and Boost Web's crossclaim (the "April 11 decision").[4]  The court

---

[4]  The district court first issued a memorandum of decision on March 20, 2024.  Orkin then filed a motion for reconsideration on the defamation claim and a notice of appeal.  The April 11 decision is an amended memorandum of decision reflecting non-substantive changes made in response to Boost Web's motion to

- 9 -

first ruled in favor of Albert and her son on Orkin's defamation, breach of fiduciary duty, breach of contract, and unjust enrichment claims.[5]  It accordingly declined to order Orkin's requested injunctive relief.  Relevant to this appeal, the court rejected Orkin's claim that Albert's April 29, 2021 email to CardConnect defamed Orkin.  The court reasoned that the email neither damaged Orkin's reputation in the community nor caused him economic loss. It also found that the email was not actionable without proof of economic loss because it did not charge him with a crime but rather was "merely indicative of [Albert]'s truthful intent to take an action."  Orkin, 729 F. Supp. 3d at 208.  The court further found that, in any event, Albert had shown an affirmative defense because the email was "materially true" and there was "no evidence that [Albert] acted with actual malice."  Id.

The court then turned to Boost Web's conversion claim against Orkin.  It found that Orkin converted Boost Web funds in two ways: first, by using $403,827.91 in Boost Web funds for personal and unrelated business expenses, and second, by

---

correct and rejecting Orkin's motion for reconsideration.  After Orkin filed a notice of appeal of the April 11 decision, he moved to dismiss his appeal of the earlier order, which we granted.

[5]  As to these claims against Albert and her son, Orkin appeals only the judgment against him on his defamation claim against Albert.

redirecting $234,941.60 in residuals to himself (through MKY) per the Redirection Agreement.

As to the personal expenses, the district court found that Orkin could not provide a business-related reason for his use of those funds from Boost Web's bank account and that "[n]othing in the record establishes that [he] could rightfully use Boost Web funds to pay for his personal expenses or other business expenses to benefit himself."  Id. at 223-24.  The court further found that, "[t]o the extent a demand for repayment is required [to prove conversion] under Florida law," that element was satisfied because a Boost Web accountant had asked Orkin for receipts to document his use of Boost Web funds.  Id. at 223.

As to the redirected residuals, the district court found that, although Orkin "indisputably ran Boost Web's day-to-day operations," he had no actual or apparent authority to redirect residuals on its behalf.  Id. at 219-20.

As a result of the foregoing findings, the court ordered CardConnect to transfer the escrowed residuals into Boost Web's bank account or as directed by Boost Web, asserting the court's authority to enforce its grant of relief against a nonparty.  It also awarded Boost Web damages of $638,769.51: $403,827.91, the amount it claimed Orkin used for personal expenses in 2020 and 2021, plus $234,941.60 to account for residuals already paid by

CardConnect to MKY.  Orkin timely appealed and filed a motion to stay the judgment pending appeal.

On April 19, 2024, while that motion and this appeal were pending, counsel for Orkin contacted CardConnect, claiming that "it [wa]s highly likely that Mr. Orkin will be successful in his Appeal" and therefore that "neither parties' claims . . . ha[d] been finally adjudicated by the Court."  On April 26, 2024, counsel again contacted CardConnect to reiterate the same claim.  Three days later, he made contact again, emphasizing that "the Order of the Court is not clear . . . that CardConnect must disburse the funds it is holding to Boost Web at this time."  Meanwhile, Orkin also filed a complaint in Florida state court against Albert and Boost Web, seeking both a declaratory judgment that Orkin was the owner of Boost Web and an injunction to preserve Boost Web's assets (the "Florida action").  Orkin did not notify the Florida court of the federal litigation in Massachusetts; nor did he notify the district court of the Florida action.

In response to Orkin's repeated communications, CardConnect filed a motion for leave to deposit the contested escrow funds with the district court, seeking to avoid any potential liability.  On May 2, 2024, the district court held a hearing on CardConnect's motion and Orkin's motion to stay its judgment.  During the hearing, the court told counsel for Orkin that "[his] letter to CardConnect was not only inappropriate, it

- 12 -

misstated what we have as a factual basis," which was a "verdict against" Orkin. The court denied Orkin's motion to stay the judgment and denied CardConnect's motion for leave to deposit funds (the "May 2 decision"). The court then awarded Boost Web additional prejudgment interest of $169,691.87 and "declare[d]" that, "in accordance with" its April 11 decision, "the funds being held by CardConnect representing residuals from merchant accounts payable to Boost Web since August 2021 belong to Boost Web."

Later that day, counsel for Orkin again contacted CardConnect, demanding it continue to hold the residuals in reserve pending resolution of the Florida action and threatening liability for any funds Orkin might be unable to recover should CardConnect disburse them to Boost Web. Notwithstanding this additional communication, on May 7, 2024, CardConnect complied with the district court's order to transfer the remaining residuals to Boost Web. Meanwhile, in the Florida action, Orkin moved to enjoin Albert from accessing any funds CardConnect released to Boost Web. And back in the district court, Boost Web and Albert moved for a temporary restraining order (TRO) to prevent Orkin from litigating the Florida action, which the district court granted on May 14, 2024.

On June 24, 2024, the district court issued a memorandum and order finding Orkin to be in civil contempt of court "for his repeated actions to undermine and controvert explicit court

orders" dating back to the April 11 decision (the "contempt order"). <u>Orkin</u> v. <u>Albert</u>, 738 F. Supp. 3d 84, 86 (D. Mass. 2024).[6] In addition to citing Orkin's repeated attempts to urge CardConnect not to release funds to Boost Web, the court characterized the Florida action "as nothing other than an attempt to play 'judicial hopscotch' and get another bite at the apple with a different judge because Mr. Orkin did not like the outcome in his case before this Court." <u>Id.</u> at 91-92. As a result of what the court saw as "a pattern of contemptuous behavior . . . that rises to level of harassment of a non-party," the court ordered Orkin to pay $8,000 in sanctions to the court -- $2,000 for each of the four times he contacted CardConnect through counsel to demand it not disburse the residual funds -- and $12,000 in sanctions to counsel for Boost Web, both due within thirty days of the court's initial oral order for sanctions on May 28, 2024. <u>Id.</u> at 93.

On July 8, 2024, the district court converted its TRO into a permanent injunction enjoining Orkin from litigating the Florida action or "any action . . . that purports to relitigate the issue of ownership of Boost Web or any other issue that was decided by" the April 11 decision or "further explained" in its

_____

[6] The district court first declared Orkin to be in contempt of court on May 13, 2024. <u>Orkin</u>, 738 F. Supp. 3d at 86. The court held a contempt hearing on May 28, 2024, where it confirmed its finding of contempt and first ordered Orkin to pay the sanctions recounted here. <u>Id.</u> The court's written memorandum and order followed on June 24, 2024. <u>Id.</u>

May 2 decision (the "injunction order").  Orkin v. Albert, 742 F. Supp. 3d 17, 21 (D. Mass. 2024).  It concluded that an injunction was warranted under the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283, reasoning that its April 11 decision conclusively decided the issue of who owned Boost Web and that any additional arguments to that effect that Orkin might make in the Florida action were "barred as arising under the same nucleus of operative facts."  Id. at 24.

Orkin filed timely notices of appeal of the April 11 decision, the contempt order, and the injunction order.  This court then consolidated the appeals.

## II.

We turn now to Orkin's appeal of the April 11 decision, which, as relevant here, found that Albert was not liable to Orkin for defamation and that Orkin was liable to Boost Web for conversion.

When a district court conducts a bench trial, we review its legal determinations de novo, factual findings for clear error, and mixed questions of law and fact with deference.  Aadland v. Boat Santa Rita II, Inc., 42 F.4th 34, 41 (1st Cir. 2022).

## A.

Orkin first challenges the district court's finding that Albert did not defame him in her April 29, 2021 email.  That email advised CardConnect that, in relevant part, Boost Web "ha[d] been

experiencing fraudulent activities with a Wayne Orkin . . . . This is currently a civil and criminal matter that is being pursued."

> Under Massachusetts law, defamation requires:
>
> (1) that the defendant made a statement, concerning the plaintiff, to a third party; (2) that the statement was defamatory such that it could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable without proof of economic loss.

Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (cleaned up).[7] The district court found for Albert on the second and fourth elements of this test. On the second, the court reasoned that Albert's statement was not defamatory because there was no evidence that the statement actually harmed Orkin's reputation in the community. On the fourth, the district court found that the statement was not actionable without proof of economic damages because it expressed only an intention on Albert's part to take

---

[7] Because this is a diversity case, we apply state substantive law. Shay, 702 F.3d at 79. The district court applied Massachusetts law to Orkin's defamation claim, and both Albert and Orkin continue to apply Massachusetts law to this defamation claim on appeal; accordingly, so do we. See id. at 79-80; Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011) ("[W]hen the parties agree on what substantive law controls, a federal court 'ordinarily should' honor the agreement." (quoting Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987))).

legal action against Orkin, and that there was no requisite showing of economic damages.

Turning first to the second element, in Massachusetts "[t]he question of whether a statement is reasonably susceptible of a defamatory meaning is a threshold question for the court." Shay, 702 F.3d at 81. Normally, then, we assess defamatory meaning de novo, "in light of the entire context of the publication" and from the perspective of "a 'reasonable reader.'" Amrak Prods., Inc. v. Morton, 410 F.3d 69, 72-73 (1st Cir. 2005) (quoting Foley v. Lowell Sun Publ'g Co., 533 N.E.2d 196, 197 (Mass. 1989)). But "[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the [factfinder]," Jones v. Taibbi, 512 N.E.2d 260, 264 (Mass. 1987); because such cases present mixed questions of law and fact, we give the district court's findings more deference, Aadland, 42 F.4th at 41.

We begin by noting that the district court recited the correct standard on this issue, including the requirement that the allegedly defamatory statement must be "such that it could damage the plaintiff's reputation in the community." Shay, 702 F.3d at 81 (emphasis added). But the court appears to have applied a different standard in concluding that, given that CardConnect continued to do business with Orkin, he failed to make out a defamation claim because Albert's statement "did not damage his

- 17 -

reputation in the community." Orkin, 729 F. Supp. 3d at 207 (emphasis added). This was legal error. See Shay, 702 F.3d at 81; Restatement (Second) of Torts § 559 cmt. d (A.L.I. 1977) ("To be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect.").

With the inquiry properly framed, we see no reasonable way to read Albert's email as not containing assertions that could damage Orkin's reputation in the community. The email had two relevant assertions: that "[Albert and Boost Web] have been experiencing fraudulent activities with a Wayne Orkin," and that "this is a civil and criminal matter that is being pursued." Focusing only on the latter assertion, the district court concluded that the email was "merely indicative of [Albert]'s truthful intent to take action." Orkin, 729 F. Supp. 3d at 208. But read as a whole, the email quite clearly accused Orkin of criminal fraud. Stating that "we have been experiencing fraudulent activities" with someone is simply a more indirect, but no less certain, way of stating that the person has committed fraud. And if that were not enough, Albert's email also clarified that those fraudulent activities constituted a "criminal matter," indeed one "that is being pursued." Orkin, 729 F. Supp. 3d at 205 (emphasis added). The passive voice -- and the question that naturally arises of

who, in fact, was pursuing the matter -- hardly detract from the meaning that a reasonable reader would derive from this email. See Amrak Prods., Inc., 410 F.3d at 72-73. This email unambiguously "imputes to [Orkin] a criminal offense." Restatement (Second) of Torts § 571 (A.L.I. 1977). Notably, other than reciting the district court's conclusion, Albert hardly argues otherwise. And because "[a]n imputation of crime is defamatory per se," Jones, 512 N.E.2d at 264, we conclude that the email was not only susceptible to a defamatory meaning but that it unambiguously carried such a meaning.[8]

This conclusion also necessarily undermines the district court's finding on the fourth element that Orkin's claim was not actionable without proof of economic damages. A statement that charges a plaintiff with a crime exempts the plaintiff from the general rule that defamation claimants must show economic damages. See Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 511 (Mass. 2003). The district court found that this exception did not apply because Albert's email did not charge Orkin with a crime. But, as we have explained, we think Albert's email unambiguously did so. Thus, we

_____

[8] Albert notes that ambiguous conduct cannot support a defamation per se claim. But the case she relies on deals with conduct that "did not have a specific, obvious meaning and did not necessarily convey that [the plaintiff] had engaged in criminal wrongdoing." Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 555 (Mass. 2004). This caselaw has no bearing on our analysis here, where we find Albert's email unambiguously imputed criminal conduct to Orkin.

agree with Orkin that it is actionable without proof of economic damages.[9]

This leaves the district court's finding that, even if Albert's statement was defamatory, she had shown a complete defense[10] to Orkin's defamation claim because the email was "materially true" and "there [wa]s no evidence she acted with actual malice." Orkin, 729 F. Supp. 3d at 208; see Ravnikar, 782 N.E.2d at 510 n.3 (explaining that, in order to recover under Massachusetts law for defamation of someone who is not a public figure, a statement must either be false or true but published in writing with actual malice); Mass. Gen. Laws ch. 231, § 92 (2025) ("The defendant in an action for writing . . . a libel may introduce in evidence the truth of the matter contained in the publication charged as libellous; and the truth shall be a justification unless actual malice is proved."). It is evident that the court's finding of truth flowed inexorably from its interpretation of the email as merely expressing an intention -- an interpretation that we deem erroneous. In other words, the district court never made a finding as to the truth of the

---

[9] This is not to say that the district court erred in finding no economic damages.

[10] The district court presumed the burden was on Albert to prove her statement was substantially true as an affirmative defense. Neither party challenged this allocation of the burden below or on appeal, so for the purposes of this case we will assume it is appropriate without opining on our own.

statement's imputation to Orkin of activities constituting criminal fraud. Nor did it elsewhere make a finding that Orkin committed criminal fraud.

To summarize, as a matter of law Albert made a statement to a third party concerning Orkin that could damage Orkin's reputation in the community, and the substance of the statement was such that Orkin's failure to prove economic harm does not defeat his claim. On remand, the factfinder will need to determine whether the statement was true, in which case the defamation claim fails,[11] or was false, in which case the factfinder will need to determine whether Albert was at fault in making the statement and -- if so -- whether and to what extent the statement caused noneconomic damage to Orkin.

**B.**

Orkin also challenges the district court's findings that he converted two groups of Boost Web funds by (1) using $403,827.91 in Boost Web funds for personal expenses and (2) causing CardConnect to send $234,941.60 in residuals to MKY.

**1.**

We begin with Orkin's claim that neither group of funds was capable of being converted because they were not specifically

---

[11] Orkin does not develop any argument on appeal that Albert could be found to have acted with actual malice on this record if her statement was true.

identifiable and/or they simply constituted damages for breach of a contract. Because Florida[12] courts have suggested that the question of whether the property at issue can support a conversion action is a "point of law," Douglas v. Braman Porsche Audi, Inc., 451 So. 2d 1038, 1039 (Fla. Dist. Ct. App. 1984), we apply de novo review to the answer to that question, Aadland, 42 F.4th at 41. To the extent we review only the district court's application of law to facts, however, we extend its findings some deference. See id.

Orkin presents his identifiability argument as applicable to both the amounts referred to as personal expenses and the residuals redirected from CardConnect to his benefit. In response, Boost Web does not argue that either category of funds was specifically identifiable. Rather, it argues that, under Florida law, the identification requirement applies only to

---

[12] Because this case rests on diversity jurisdiction, we apply the choice-of-law rules of the forum state: Massachusetts. Mariasch v. Gillette Co., 521 F.3d 68, 71 (1st Cir. 2008). And under Massachusetts' internal affairs doctrine, we apply "the law of the State of incorporation in matters relating to the internal affairs of a corporation." Harrison v. NetCentric Corp., 744 N.E.2d 622, 628 (Mass. 2001); see also Mariasch, 521 F.3d at 71–72 (applying the internal affairs doctrine in a diversity case). Thus, as the parties all agree, we apply the laws of Florida -- Boost Web's state of incorporation -- to the company's conversion claim, which centers on its "internal affairs." Harrison, 744 N.E.2d at 628; see also JLA Inv. S.A. v. Computershare Tr. Co., N.A., No. 15-cv-11474-ADB, 2017 WL 354008, at *6 (D. Mass. Jan. 23, 2017) (applying the internal affairs doctrine to tort-based claims like conversion when they involve the internal affairs of a corporation).

contractual disputes and that, because this is not a contractual dispute, Boost Web need not show the funds were specifically identifiable.

Orkin does not challenge the premise that the funds need not be specifically identifiable if they are not damages for breach of a contract; indeed, he concedes that the purpose of the identification requirement is to ensure that a contract dispute is not transformed into a conversion claim. And the caselaw supports this shared understanding. "[W]hen the parties have a contractual relationship," a claim for conversion "must go beyond, and be independent from, a failure to comply with the terms of [the] contract." Transcapital Bank v. Shadowbrook at Vero, LLC, 226 So. 3d 856, 864 (Fla. Dist. Ct. App. 2017) (quotation marks omitted). A court's threshold determination that the funds in question are identifiable thus "ensures . . . the claimant is not merely transforming a contract dispute into a conversion claim." Frayman v. Douglas Elliman Realty, LLC, 515 F. Supp. 3d 1262, 1286 (S.D. Fla. 2021). But when there is no contractual relationship between parties, a claim "[can]not be characterized as an attempt to transform a breach of contract action into a tort action" and so is "not the type of claim to which the specific fund requirement was intended to apply." Bel-Bel Int'l Corp. v. Comm. Bank of Homestead, 162 F.3d 1101, 1109 (11th Cir. 1998) (applying Florida law); see also Zinn v. Zinn, 549 So. 2d 1141, 1142 (Fla. Dist. Ct.

App. 1989) (rejecting defendants' argument that funds were not specifically identifiable and characterizing caselaw concerning the identifiability requirement as "inapplicable" because the defendants were under no individual contractual obligations to the plaintiffs).

We evaluate Orkin's arguments against these agreed-upon principles.

**a.**

We start with the identifiability of the residuals redirected to MKY or held by CardConnect. Orkin argues these funds were in the nature of contractual damages. But, while Orkin points to contracts between PTMS and Boost Web on the one hand and CardConnect on the other hand, he does not argue that the claim against him by Boost Web is or could be a claim against him for breach of those contracts. The claim against Orkin is not that he breached an agreement between him and anyone else concerning the residuals. Rather, the claim is that he stepped in and misappropriated funds owed by CardConnect to Boost Web by redirecting those funds to MKY. Accordingly, the dispute over the residuals is "not the type of claim to which the specific fund requirement was intended to apply." Bel-Bel Int'l Corp., 162 F.3d at 1109. And Orkin points to no Florida law holding that a party harmed by such a misappropriation need do more than establish the amount of funds wrongfully taken in order to make out a claim for

- 24 -

conversion. We therefore reject Orkin's argument as presented concerning the identifiability of the redirected residuals.

**b.**

Turning to the amounts the district court found Orkin spent on personal expenses, the possibility remains that those amounts, if excessive, might be seen as both not specifically identifiable and a breach of the understanding inferred from the decade-long conduct of Orkin and Albert. In light of our holding in the next part of this opinion vacating the judgment finding Orkin liable for the full extent of those amounts, we leave for the district court on remand the question of whether any excessive withdrawals might be seen as conversions or rather as contractual damages.

**2.**

We turn now to the district court's two-part conclusion that, in 2021 and 2022, Orkin spent $403,827.91 on personal expenses rather than on Boost Web business expenses, and that Orkin had no authority to take any Boost Web money for himself. These conclusions serve as the two legs on which stands the finding that Orkin wrongfully converted $403,827.91 from Boost Web's account, since "in Florida, the tort of conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1140 (11th

- 25 -

Cir. 1994) (cleaned up).  We consider in turn Orkin's challenges to each part of this conclusion.  As factual conclusions, we review each for clear error.[13]  Aadland, 42 F.4th at 41.

### a.

First, we agree with Albert that the district court did not clearly err in its conclusion that Orkin withdrew $403,827.91 from Boost Web accounts for non-Boost Web expenses.  In their briefs -- as below -- neither party well documented a position on the amount of nonbusiness expenses paid, each claiming that the burden was on the other.  However, even assuming the burden was Boost Web's, there was no clear error here.

The district court heard testimony that Orkin had historically used Boost Web funds for personal expenses and then reconciled those expenses with the Boost Web accountants.  In light

---

[13] The amount of money Orkin withdrew is a factual finding underlying a damages calculation, which we review for clear error. Bruce v. Weekly World News, Inc., 310 F.3d 25, 28 (1st Cir. 2002) ("[We] will upset the underlying factual findings [for calculating damages] only upon a showing of clear error.").  Orkin urges us to apply de novo review to this question instead, relying on our statement in Aadland that we review "determinations about the sufficiency of the evidence" at a bench trial de novo.  42 F.4th at 41.  But, as Boost Web points out, that language in Aadland refers to this court's de novo review of whether a legal standard has been met by the evidence, as in cases reviewing summary judgment orders.  See, e.g., Sierra Fria Corp. v. Evans, 127 F.3d 175, 181 n.2 (1st Cir. 1997).  That is not the situation we have here.

Whether an implied contract exists is also a question of fact under Florida law.  Farmer v. Humana, Inc., 582 F. Supp. 3d 1176, 1187 (M.D. Fla. 2022).

of this course of conduct, when Orkin failed to provide receipts -- first to Boost Web's accountants and later to the court despite its order to do so -- showing any of his expenses from 2020 or 2021 were for Boost Web purposes, it was reasonable for the court to conclude that all of those expenses were personal. Boost Web's accountants apparently concluded the same when they issued Orkin 1099s for all of his expenditures in the relevant years: $211,167.68 in 2020 and $192,660.23 in 2021. We are thus not "left with the definite and firm conviction that a mistake has been committed." ST Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, 88 F.4th 27, 32 (1st Cir. 2023) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

**b.**

However, we cannot say the same for the finding that Orkin was not authorized to use any of the money as his own. The district court found that there was no agreement, express or implied, between Orkin and Albert regarding Orkin's compensation or the manner in which either could use Boost Web's funds. While we agree that there was no such express agreement, the district court clearly erred in finding that no implied agreement existed authorizing Orkin to use at least some Boost Web funds for his personal expenses.

"[A] contract implied in fact[] imposes liability[] in the absence of an express agreement, 'based on a tacit promise,

- 27 -

one that is inferred in whole or in part from the parties' conduct, not solely from their words.'" F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc., 311 So. 3d 39, 48 (Fla. Dist. Ct. App. 2021) (quoting Com. P'ship 8098 Ltd. v. Equity Contracting Co., 695 So. 2d 383, 385 (Fla. Dist. Ct. App. 1997)). A paradigmatic example is "where a person performs services at another's request, or where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances fairly raising the presumption that the parties understood and intended that compensation was to be paid," in which case "the law implies the promise to pay a reasonable amount for the services." Com. P'ship 8098, 695 So. 2d at 386 (quotation marks omitted).

We nearly have that paradigmatic example here. Orkin inarguably performed services for Boost Web: He ran all its day-to-day affairs, personally generating all of its business, resulting in considerable revenue for the company. And the record shows, without challenge, an apparently consistent practice year in and year out of Orkin using Boost Web funds for personal expenses and Boost Web treating such expenditures as Orkin's earned income, including issuing Orkin W-2s in 2018 and 2019 reporting those personal expenses as wages. Albert knew of this prolonged practice -- she signed off on the final reconciliations, issued Orkin's W-2s, and signed Boost Web's tax returns reflecting these

wages. And she apparently did not challenge it for years on end until the siblings' relationship deteriorated in 2021. These circumstances fairly raise the unrefuted inference that both parties understood and intended some compensation be paid to Orkin.

Of course, there is no documentation (other than apparently the W-2s) spelling out any understanding that the money Orkin spent on non-Boost Web expenses was compensation. But what else could it be? Certainly not a conversion, given Albert's repeated acquiescence. See Marine Transp. Servs., 16 F.3d at 1140. The alternative advanced by Albert makes no practical sense -- and is inequitable: If Orkin was not allowed to use any Boost Web funds for personal expenses in 2020 and 2021, then Orkin would realize zero compensation, with all revenues net of business expenses going to Boost Web, which Albert in turn claims belongs solely to her. Even clerics who take a vow of poverty get more income than Orkin would under Albert's retrospective view of their arrangement. These are precisely the circumstances under which the law implies a promise to pay a reasonable amount for Orkin's services. See Com. P'ship 8098, 695 So. 2d at 386.

Despite this, the district court found no implied contract existed regarding Orkin's use of Boost Web funds for personal expenses because of the "lack of specificity as to the details" of Orkin and Albert's arrangement, leaning on case law establishing that the "failure to reduce uncertainties to definite

terms [can be] fatal" to a contract's enforceability. Orkin, 729 F. Supp. 3d at 210 (alteration in original) (quotation marks omitted). But an implied contract must, by definition, lack specificity to some degree; after all, there is by definition no written document in which the specifics would be established. See Rhythm & Hues, LLC v. Nature's Lawn Care, Inc., 368 So. 3d 12, 15 (Fla. Dist. Ct. App. 2023) ("A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement." (quotation marks omitted)). Relevant here, implied contract caselaw clearly contemplates that the court will determine what constitutes a reasonable amount to be paid for services, Com. P'ship 8098, 695 So. 2d at 386 -- even though "[p]rice or compensation is typically an essential term of a contract," Focus Mgmt. Grp. USA, Inc. v. King, 171 F. Supp. 3d 1291, 1297 (Fla. Dist. Ct. App. 2016).

The fundamentally uncertain nature of human conduct ungoverned by a written understanding demands a higher tolerance for imprecision in implied-in-fact contracts than their written counterparts. Otherwise, we are left to conclude that where detail is lacking there has been no agreement at all -- and so, in cases like this one, the funds at issue belong to whoever manages to grab them first, a conclusion at odds with basic notions of equity. See Magwood v. Tate, 835 So. 2d 1241, 1243 (Fla. Dist. Ct. App.

- 30 -

2003) ("[C]onsiderations of equity and morality play a large part in the process of finding a promise by inference of fact . . . ." (quoting 1 Arthur Linton Corbin, Corbin on Contracts § 1.20(a) (Joseph M. Perillo ed., 1993))).

This does not mean, of course, that an implied-in-fact contract requires no specificity of terms. See Farmer, 582 F. Supp. 3d at 1187;[14] cf. Atl. Coast Line R.R. Co. v. Wilson & Toomer Fertilizer Co., 104 So. 593, 595 (Fla. 1925) ("The usage or custom that may have the force and effect of . . . an implied contract . . . must be clearly and definitely proven; and, where the evidence is uncertain and also contradictory, the usage or custom is not established."). But whatever else about Orkin and Albert's arrangement may be uncertain,[15] it is clear from their conduct that Orkin regularly used at least some Boost Web funds for personal expenses and was issued W-2s for those amounts, and

---

[14] In Farmer, the district court required "specificity in terms" to establish an implied contract under Florida law. 582 F. Supp. 3d at 1187. The court found Farmer had adequately alleged an implied contract with a term requiring his insurer to safeguard his data because when "a person hands over sensitive information, in addition to receiving a . . . service, they presumably expect to receive an implicit assurance that the information will be protected." Id. (alteration in original) (quoting Castillo v. Seagate Tech., LLC, No. 16-CV-01958-RS, 2016 WL 9280242, at *9 (N.D. Cal. Sept. 14, 2016)).

[15] For instance, the district court found there was no agreement specific enough to be enforceable regarding how Albert should respond to unauthorized expenditures or granting Orkin "unfettered" access to the company's bank account.

- 31 -

Albert regularly acquiesced to this practice. This conduct is adequately specific to show an agreement in which Orkin was entitled to some level of recompense for his labors, either as wages or, if he has an ownership interest, as dividends or an increase in the value of that ownership interest.

None of this is to say that the entire $403,827.91 for which Orkin received 1099s in 2020 and 2021 is properly seen as compensation -- as opposed, for example, to profit that might be paid out to Boost Web's owner(s). As best we can tell, amounts taken by Orkin in prior years were much smaller.[16] But, then again, it was principally (but not exclusively) Orkin's efforts that apparently increased revenues markedly in the more recent years. What compensation was reasonable for Orkin's efforts -- and whether too much was taken in 2020 and 2021 -- will have to be estimated on remand.[17] For now, we hold that there was clear error in finding that Orkin had no right to take at least some of the $403,827.91 for himself as compensation, assuming he has no ownership interest in Boost Web. And that finding, in turn, requires that we vacate

---

[16] For example, Orkin testified that he received approximately $15,000 in compensation in 2019.

[17] If the district court does find that Orkin helped himself to too much, the question of whether any such excess can be said to have been converted may turn on facts not now in the record. For now, as the record presently stands, we cannot say whether any excess is identifiable in a way that would be required to support a conversion claim. Nor do we opine on whether any party may amend its pleading.

the judgment of conversion as it pertains to personal expenses retained by Orkin.[18]

**3.**

We turn now to Boost Web's second conversion claim and the district court's finding that Orkin converted $234,941.60 in residuals by signing the Redirection Agreement with CardConnect that diverted those funds away from Boost Web.

**a.**

We first examine whether Orkin's redirection of the residuals at issue was an unauthorized act. Because issues of agency are a question of fact, Kobel v. Schlosser, 614 So. 2d 6, 6 (Fla. Dist. Ct. App. 1993), we review for clear error, Aadland, 42 F.4th at 41.

---

[18] Orkin also argues that Boost Web did not make a demand for the return of those funds, nor did he refuse any such demand. But, under Florida law, "it is unnecessary to prove a demand and refusal where conversion can otherwise be shown." Fla. Dep't Ins. v. Debenture Guar., 921 F. Supp. 750, 757 (M.D. Fla. 1996); see also Goodrich v. Malowney, 157 So. 2d 829, 832 (Fla. Dist. Ct. App. 1963) ("The purpose of proving [demand and refusal] in an action for conversion is to show the conversion. The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made."). And where we otherwise vacate the district court's finding that Orkin "wrongfully asserted" his "dominion . . . over [Boost Web]'s property," Belford Trucking Co., 243 So. 2d at 648, we leave it for the district court on remand to consider, if Orkin used any funds improperly, whether there needed to be and whether there in fact was a demand and refusal.

The district court found Orkin had no authority -- actual, apparent, or implied -- to redirect residuals away from Boost Web. The court focused on Orkin's motivations for signing the Redirection Agreement, emphasizing that any authority he did have to conduct Boost Web's affairs extended only to endeavors in Boost Web's best interests, and that here, Orkin was acting for a private interest of his own rather than Boost Web's.

Even assuming Orkin had authority to sign some agreements on Boost Web's behalf, he cannot establish clear error in the district court's finding that he lacked authority to sign the Redirection Agreement.[19] To be sure, at trial, Orkin testified that he signed the agreement to obtain funds to support "merchants in the Boost portfolio," and that he was acting on behalf of Boost Web when he did so. But he also admitted that the redirection of the funds to MKY was in fact a redirection of those funds to himself,[20] testifying that MKY sent the residuals to a personal

---

[19] Orkin challenges the district court's finding that he lacked actual, apparent, or implied authority to redirect the residuals, in particular its finding that his implied authority to run Boost Web's daily operations did not include the authority to sign agreements directing residuals on its behalf. We need not reach this argument because we find the district court's alternative holding -- that even if Orkin had such authority, the specific Redirection Agreement at issue exceeded its scope -- suffices.

[20] Orkin argues that as far as Card Connect was concerned, "PTMS, Boost Web and Wayne Orkin were one in the same." Even if that were so, this does not mean that Orkin could indiscriminately redirect money from Boost Web to himself in his personal capacity:

bank account.  And he testified that he wanted to redirect the residuals away from Boost Web because he wanted to ensure that "Boost would not receive the revenues."

As the factfinder, the district court was entitled to draw its own conclusions in the face of this contradictory testimony.  See Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26, 35 (1st Cir. 2019) ("Within wide limits, credibility determinations [in a bench trial] are committed to the sound judgment of the trial court.").  Thus, the district court's finding that Orkin signed the Redirection Agreement to retaliate against Albert -- and not in Boost Web's best interests -- was not clearly erroneous.  See State Police Ass'n of Mass. v. Comm'r of Internal Revenue, 125 F.3d 1, 5 (1st Cir. 1997) (stating the clear error standard means accepting the district court's finding "unless, after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong").  And Orkin offers no argument that such an action not in Boost Web's interest would be within the scope of his authority.  In sum, we need not disturb the district court's

---

"The general rule is that corporations are legal entities separate and distinct from the persons comprising them."  Mane FL Corp. v. Beckman, 355 So. 3d 418, 429 (Fla. Dist. Ct. App. 2023) (quoting Am. States Ins. Co. v. Kelley, 446 So. 2d 1085, 1086 (Fla. Dist. Ct. App. 1984)).

finding that Orkin lacked authority to sign the Redirection Agreement.

**b.**

We next examine whether the allegedly converted residuals belonged to Boost Web in the first place. To establish conversion, a plaintiff must show an ownership interest in the property at issue. See Edwards v. Landsman, 51 So. 3d 1208, 1213 (Fla. Dist. Ct. App. 2011) ("[T]o state a claim for conversion, one must . . . show ownership of the subject property . . . ."). Orkin argues that the Consent Agreement did not give Boost Web an ownership interest in the residuals -- or at least not those attributable to merchant relationships that Orkin originated after the Consent Agreement was signed. All parties agree that we should apply Ohio law to this question, in accordance with the Consent Agreement's choice-of-law provision. And because this issue turns on the district court's interpretation of the Consent Agreement, which is a purely legal issue, our review is de novo. Holsum de P.R., Inc. v. ITW Food Equip. Grp. LLC, 116 F.4th 59, 66 (1st Cir. 2024).

In support of his claim that the Consent Agreement did not give Boost Web a property interest in the residuals, Orkin makes two arguments in the alternative. First, he argues the Consent Agreement was invalid in its entirety. Second, he contends that, even if valid, the Consent Agreement unambiguously did not

assign to Boost Web at least some of the residuals directed to MKY -- the residuals from merchants originated after January 2014.

We begin with Orkin's claim that no valid assignment agreement ever existed. Orkin points to the fact that the document he signed was entitled "Consent to Assignment" rather than "Assignment" and that it suggests in its text that there is some other document that actually makes the assignment, which he then argues never existed.[21] The Consent Agreement, however -- in addition to confirming the parties' consent that there be an assignment -- contains a clause itself entitled "Assignment," which states: "The parties hereto hereby agree that as of January 23, 2014 (the 'Effective Date'), the Assignment will take effect and the residuals for the Merchants Assigned shall be paid to [Boost Web] after such date. As such, all payments after the Effective Date shall be made to [Boost Web]." And later in its provisions, the Consent Agreement refers to itself as "this Assignment." So, at worst, the Consent Agreement is

---

[21] Despite clear language in the Consent Agreement that Orkin signed stating "[PTMS] acknowledges receipt of good and sufficient consideration for giving effect to the Assignment," Orkin now argues that any assignment from PTMS to Boost Web was unsupported by consideration and thus constitutes a "gift" rather than a valid assignment. Because Orkin did not clearly raise this argument below, we decline to address it. See Teamsters Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

ambiguous -- and that ambiguity is clearly resolved by Orkin's own subsequent conduct,[22] and indeed by statements he has made in this litigation,[23] demonstrating that he understood a valid assignment from PTMS to Boost Web had occurred.

We turn next to Orkin's claim that the Consent Agreement, even if valid, unambiguously did not assign to Boost Web residuals from any merchant accounts originated after it was signed in 2014.[24] In support, Orkin points to a paragraph in the Consent Agreement reciting that CardConnect would only consider merchant accounts originated by PTMS after the Consent Agreement was signed to be

---

[22] From 2014, when the Consent Agreement was signed, until April 2021, CardConnect paid Boost Web all residuals for all merchants originated by PTMS. Boost Web treated these deposits as revenue and used them to fund Boost Web's operations -- at Orkin's direction.

[23] When asked what the Consent Agreement was, Orkin testified, "It's a consign -- assignment." His counsel asked: "The assignment agreement?" and he responded affirmatively: "The assigning to Boost Web." Upon further prompting by counsel, Orkin confirmed the Consent Agreement was "the agreement that sends the money from [PTMS] to Boost Web." He later testified that the "purpose" of the Consent Agreement was "[t]o transfer revenue from [PTMS] over to the Boost operating account" and referred to the Consent Agreement as "the assignment of the existing merchants from [PTMS] to Boost." And in his brief on appeal, Orkin states flat out that "[i]n 2014, [] Orkin, as PTMS and Boost Web, signed a Consent to Assignment Agreement with [CardConnect] that assigned the rights to certain . . . merchant residuals to Boost Web."

[24] Orkin also argues that the contract was invalid because PTMS could not assign the rights for merchants it had not originated because its property right in those residuals was not yet vested. Because Orkin did not raise this argument below, it, too, is waived. Teamsters Union, 953 F.2d at 21.

subject to its provisions if PTMS and Boost Web executed a written agreement to that effect. Orkin argues that, given this language, the district court erred in finding the Consent Agreement ambiguous and thus never should have looked to the parties' conduct to clarify its meaning or applicability.

We begin by interpreting the Consent Agreement and find it ambiguous and incomplete in terms of the merchant accounts to which it applies. The Consent Agreement is missing key attachments that purport to list those merchant accounts, and the "plain" language to which Orkin points only addresses residuals from merchants originated by Orkin on behalf of PTMS -- when Orkin himself testified that PTMS did no further business after it assigned its portfolio to Boost Web. It is thus unclear at best what, if anything, the Consent Agreement has to say regarding the residuals at issue.

Finding the Consent Agreement ambiguous insofar as the residuals are concerned, we look, as the district court did, to the conduct of the parties.[25]  See Envision Waste Servs., LLC v.

_____

[25] Although we reach our conclusion as a matter of interpreting the Consent Agreement, we note for completeness that the same result would obtain were we to consider the Consent Agreement wholly inapplicable to residuals originated by Orkin not on behalf of PTMS, in which case we would look to the parties' conduct as creating an implied contract redirecting such residuals to Boost Web or, alternatively, a modification of the Consent Agreement by conduct to encompass them. See Union Sav. Bank v. Lawyers Title Ins., 946 N.E.2d 835, 841 (Ohio Ct. App. 2010) ("An

Cnty. of Medina, 83 N.E.3d 270, 276 (Ohio Ct. App. 2017) (noting that extrinsic evidence, including "any acts by the parties that demonstrate the construction they gave to their agreement," is "admissible to ascertain the intent of the parties when the contract is unclear or ambiguous" (quoting Lutz v. Chesapeake Appalachia, L.L.C., 71 N.E.3d 1010, 1012 (Ohio 2016))). That conduct makes clear what the Consent Agreement does not: The parties understood the residuals, including those from merchants originated after the signing of the Consent Agreement, to belong to Boost Web. Orkin testified that he consented to and caused the residuals to be paid to Boost Web, and never claimed they belonged to him or PTMS until the present litigation. And CardConnect, in forwarding residuals to Boost Web after the Consent Agreement was signed, never distinguished between accounts originated by Orkin before and after the Consent Agreement.

In sum, the parties' conduct clearly supports the district court's conclusion that the residuals belonged to Boost Web. We will not disturb that conclusion here, especially when equity points to the same result. Whether Boost Web, in turn,

---

implied-in-fact contract arises from the conduct of the parties or circumstances surrounding the transaction . . . despite the absence of any formal agreement."); Grzely v. Singer, 971 N.E.2d 481, 486 (Ohio Ct. App. 2012) ("[T]he terms of a [contract] may be modified or waived by . . . the conduct . . . of the parties." (quotation marks omitted)).

owes anything to Orkin on account of its receipt of the residuals remains an issue to be decided on remand.

## III.

We next turn to Orkin's appeal of the district court's contempt order. We review the district court's findings of fact for clear error and its ultimate finding of contempt for abuse of discretion. Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991).

To issue a contempt order, a district court must establish by clear and convincing evidence "(1) that the alleged contemnor had notice that he was within the order's ambit, (2) that the order was clear and unambiguous, (3) that the alleged contemnor had the ability to comply, and (4) that the order was indeed violated." United States v. Saccoccia, 433 F.3d 19, 27 (1st Cir. 2005) (cleaned up). For an order to be clear and unambiguous, it must be "able to [be] ascertain[ed] from the four corners of the order precisely what acts are forbidden." Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 76 (1st Cir. 2002) (quoting Gilday v. Dubois, 124 F.3d 277, 282 (1st Cir. 1997)). In other words, we "read court decrees to mean rather precisely what they say." NBA Props., Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990).

Here, the district court's April 11 decision "declare[d] that the funds being held by CardConnect representing residuals from merchant accounts payable to Boost Web since August 2021

- 41 -

belong to Boost Web." Orkin, 729 F. Supp. 3d at 225. It also specifically directed CardConnect to pay such residuals into Boost Web's bank account or as directed by Boost Web. Subsequently, Orkin, through counsel, repeatedly urged CardConnect to not disburse funds to Boost Web -- actions by CardConnect that would be in direct violation of the district court's directives. As a result, we reject Orkin's argument that his conduct did not violate anything clearly prohibited by the district court's previous orders.

However, the district court also based its contempt order on Orkin's pursuit of the Florida action, which seeks resolution of the question of who owns Boost Web, and on counsel's interactions with CardConnect on May 2, 2024. The district court did so by retrospectively interpreting its April 11 decision as holding that "Albert is entitled to all of Boost Web's assets as the company's incorporator and director." But the April 11 decision did not unambiguously resolve the question of ownership, as we will discuss further below. As a result, to the extent Orkin seeks in bringing the Florida action to resolve that question, he did not clearly violate the district court's prior order. See NBA Props., Inc., 895 F.2d at 32 (noting that "any ambiguities" in a district court's order "redound to the benefit of the person charged with contempt" (cleaned up)). Nor did Orkin's counsel's May 2 communications to Boost Web, at least insofar as they noted

that Orkin may be entitled to some of the funds owed to Boost Web depending on how the question of ownership was resolved.

As a result, the contempt order was founded at least in part on some conduct that did not clearly and unambiguously violate the court's previous orders. We therefore vacate the contempt order and remand for the district court to consider whether the more limited set of underlying violations supports a finding of contempt and, if so, whether its order of sanctions should be amended.

**IV.**

We now turn to Orkin's appeal of the district court's order permanently enjoining him from prosecuting the Florida action. We review such an injunction for abuse of discretion, but "within this context," we review a district court's legal conclusions de novo. Fernández-Vargas v. Pfizer, 522 F.3d 55, 68 (1st Cir. 2008).

The Anti-Injunction Act (the "Act") provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except," in relevant part, "to protect or effectuate its judgments." 28 U.S.C. § 2283. This latter provision is known as the relitigation exception, and it "provides that where a federal court has conclusively decided an issue, it may prevent the unsuccessful party from relitigating that same issue in state court." Fernández-Vargas, 522 F.3d at 68. The

Supreme Court has made clear, however, that "an essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 148 (1988).

Here, the district court enjoined Orkin "from prosecuting any action . . . that purports to relitigate the issue of ownership of Boost Web." It did so on the basis of its conclusion that its April 11 judgment decided the issue of Boost Web's ownership.

Our role is to "assess[] the precise state of the record and what the earlier federal order actually said," not what the district court's "post hoc judgment" deemed it "intended to say." Chick Kam Choo, 486 U.S. at 148 (emphases omitted). And in our view, the district court's April 11 decision made no findings sufficient to resolve the issue of ownership. It did find that Orkin was not an officer or shareholder of Boost Web; that Albert is "the principal" and listed as Boost Web's sole initial officer or director on its articles of incorporation and on yearly state reports; that Orkin managed the "day-to-day business affairs of Boost Web"; and that Boost Web has no shareholders, never elected a president or officers, and never issued shares. But these findings do not add up to a conclusion on ownership. Nor does

Albert develop an argument supporting a finding that she is the exclusive owner of Boost Web.

Albert points to (but the district court did not) the Boost Web federal tax returns from 2017 and 2018 listing Albert as holding 100% of the "voting shares." But we are loath to base any fact finding on these documents ourselves given that Albert points to no evidence that Orkin ever saw either return. Orkin further asserts that Florida law might recognize him as an equitable shareholder with an ownership stake in the company, and that in Florida, a corporation is owned by its shareholders. Without passing on the merits of these assertions, we note that they illustrate the daylight between the district court's finding in this case and the potential factfinding and analysis a court would have to do to determine ownership of Boost Web under Florida law.

As a result, we conclude that the issue Orkin pursued in the Florida action was not actually decided by the district court's previous order and therefore does not properly fall under the Act's relitigation exception. See Chick Kam Choo, 486 U.S. at 148-49 (same for a federal injunction barring Texas litigation of a claim under Singapore law where the previous federal court order dismissed petitioner's claims under the federal forum non conveniens doctrine but did not decide whether Texas courts "would consider themselves an appropriate forum" for the claim); Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281,

289-90 (1970) (same for a federal injunction preventing a railroad from seeking recourse in state court against union picketing because the previous federal court order that a union was "free to engage in self-help" did not actually decide whether it could picket).

Nor are we otherwise convinced that this case warrants the serious step of intervention in state court proceedings. See Aristud-González v. Gov. Dev. Bank for P.R., 501 F.3d 24, 28 (1st Cir. 2007) (noting the need for "substantial justification" before such intervention). In issuing its injunction, the district court emphasized that, to the extent Orkin had a claim for ownership of Boost Web that the court had not already adjudicated, such a claim would be barred by res judicata. See Mass. Sch. of L. at Andover, Inc. v. A.B.A., 142 F.3d 26, 38 (1st Cir. 1998). However, we have previously cautioned that, in the context of the relitigation exception, res judicata and preclusion defenses should, "absent unusual circumstances," be left for defendants to raise in the new state-court lawsuit. Aristud-González, 501 F.3d at 27-28. And we see no such unusual circumstances here; nor did the district court identify any to justify its action.[26] Thus, and especially in light of the "concerns of comity and federalism" raised by federal injunctions against state court litigation, Fernández-Vargas, 522

---

[26] We therefore need not resolve the parties' dispute over the applicability of res judicata in the first instance.

F.3d at 68, we hold that the district court abused its discretion by enjoining Orkin from pursuing the Florida action.

We add, too, the observation that the parties have from the outset presented this case with the cart in front of the horse. If Orkin owns all or even most of Boost Web, then whether he owes Boost Web anything becomes mostly an academic issue (or perhaps a tax issue). Conversely, as we have explained, if he does not own all or most of Boost Web, then it would be strange indeed to find that he was not able to receive any compensation in view of his actual role at the company. In either scenario, a clear resolution of the ownership issue substantially shrinks the significance of what the parties have been litigating.[27]

**V.**

For the foregoing reasons, we vacate the district court's judgment in favor of Albert on Orkin's defamation claim. Because we find that Albert's email imputed to Orkin conduct constituting criminal fraud, her statement carried a defamatory meaning and is actionable without proof of economic damages. Accordingly, we remand for the district court to consider whether that imputation was substantially true.

---

[27] While the parties dispute whether the district court already decided the ownership issue, neither argues that it cannot decide the issue on remand, especially in light of the fundamental entanglement between that issue and the claims being litigated between the two putative owners.

We affirm in part and vacate in part the district court's decisions in favor of Boost Web on its conversion claim, remanding for further proceedings consistent with this opinion. We affirm the district court's judgment finding Orkin liable for converting $234,941.60 of Boost Web funds by redirecting residuals away from Boost Web. But we vacate the district court's judgment that Orkin converted an additional $403,827.91 by taking that amount as compensation insofar as it found Orkin was not authorized to take as his own any of that money at all. We remand for the district court to determine how much Orkin was authorized to keep as compensation and whether any amount kept in excess of that authority was converted under Florida law.

We vacate and remand the district court's contempt order. In light of our finding that Orkin's pursuit of the Florida action did not clearly and unambiguously violate the court's previous orders, we leave it for the district court on remand to determine whether Orkin's remaining violations by themselves constitute contempt and whether to amend its order of sanctions.

We also vacate the district court's order of a permanent injunction against Orkin's pursuit of the Florida action. Finally, nothing in this opinion should be construed as preventing the district court from deciding, upon remand, the all-important question of ownership or the follow-up question of how that decision might bear on Orkin's claim to be entitled to receive

- 48 -

some payments from Boost Web.  We stress only that any outcome that leaves Orkin with no rights to either wages or the benefits of ownership would be difficult to justify on the record as it stands.

No costs are awarded to any party.